In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2910

REBECCA RIKER,

*Plaintiff-Appellant,*

*v.*

BRUCE LEMMON, in his official
capacity, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-00571-TWP-DML — **Tanya Walton Pratt**, *Judge.*

ARGUED FEBRUARY 13, 2015 — DECIDED AUGUST 14, 2015

Before WOOD, *Chief Judge*, and BAUER and RIPPLE, *Circuit
Judges*.

RIPPLE, *Circuit Judge*. While working as an employee of a
contractor at the Wabash Valley Correctional Facility,
Rebecca Riker engaged in a romantic relationship with
inmate Paul Vest. When the relationship became known, her
employment ended. She later requested that she be allowed
to visit Vest, but prison officials denied those requests as

forbidden by the institution's inmate visitation policy. Ms. Riker and Vest later submitted an application to marry, which prison officials also denied.

Ms. Riker then brought this action against several individual officials of the Indiana Department of Corrections ("the Department" or "IDOC"), in their official and individual capacities, challenging the denials of her requests to visit and to marry Vest. She sought damages against the individual defendants as well as declarative and injunctive relief. The district court granted the defendants' motion for summary judgment. It concluded that prohibiting Ms. Riker from visiting Vest was reasonable and that this restriction did not unconstitutionally burden her right to marry. The court also granted the individual defendants' motion for summary judgment based on qualified immunity.

In this appeal, Ms. Riker limits her challenge to the district court's determination that, based on the summary judgment record, the defendants' refusal to permit the marriage does not violate Ms. Riker's rights guaranteed by the Constitution. We respectfully disagree with the district court and conclude that, *on this record*, the defendants have failed to justify adequately the denial of Ms. Riker's marriage request. We accordingly reverse the judgment of the district court and remand the case for further proceedings.

# I

# BACKGROUND

## A.

From December 2007 through April 2008, Ms. Riker was employed by Aramark Correctional Services, Inc. ("Aramark"). Aramark contracted with the Department to operate and manage food services in the Department's correctional facilities. Ms. Riker worked at the Wabash Valley Correctional Facility ("WVCF"), a level-four maximum security correctional facility in Carlisle, Indiana. She supervised approximately twenty inmates in preparing and serving meals. As part of her job training, the Department gave her instruction in security, first aid, and personal protection skills. She also received training on WVCF emergency security procedures, including procedures for evacuation, riots, bomb threats, escape prevention, security sweeps, hostage scenarios, and emergency transport.

Ms. Riker met Vest, an IDOC inmate serving a fifty-year sentence for robbery, while working as his supervisor in the kitchen at the WVCF. After a couple of months, they began a romantic relationship, which included sexual intercourse in a walk-in cooler at the facility. In April 2008, another Aramark employee witnessed Ms. Riker and Vest kissing in the walk-in cooler and reported the incident to Ms. Riker's supervisor. Ms. Riker quit her job later that day; Vest later was disciplined by the Department.

After Ms. Riker left her job with Aramark, she maintained contact with Vest through letters and phone

calls. In May 2008, she submitted an application for visiting privileges with Vest. The WVCF denied the application because Ms. Riker had "worked at [the] facility."[1] In 2008 and 2009, Ms. Riker wrote letters to the Department's commissioner and the facility superintendent requesting visitation privileges with Vest. Both letters met the same response: the Department's policy clearly states that "ex-employees shall not be permitted to visit an offender if the relationship between the offender and the ex-employee started … during the ex-employee's period of employment with the Department."[2]

In 2010, Ms. Riker accepted a proposal of marriage from Vest. They completed an application to marry, and Vest submitted that application to the chaplain at the WVCF. The application was denied because Ms. Riker was not on Vest's list of approved visitors.[3]

Formal IDOC and WVCF policies specifically addressed staff/inmate relationships. Ms. Riker's relationship with Vest during her employment at WVCF violated IDOC policy 04-03-103, which prohibits staff-persons from having "any personal contact with an offender … beyond that necessary

---

[1] R.44-3 at 2. She submitted additional applications in February 2011, December 2012, and January 2013, all of which likewise were denied.

[2] *Id.* at 4; *accord id.* at 5.

[3] The letter denying the marriage application, which was addressed to Vest, stated: "Your fiancée would need to be on your approved visiting list in order for you to be able to be married. Ms. Riker is not on your list." R.56-3.

for the proper supervision and treatment of the offender."[4] The policy provides several examples of inappropriate contact, including: "[m]arriage to an offender," "[s]ocial relationship of any type with an offender," and "[p]hysical contact beyond that which is routinely required by specific job duties."[5] The policy also notes that "[s]exual contact with an offender is a criminal offense under IC 35-44-1-5."[6]

Under the IDOC and WVCF offender visitation policies, former employees must make a written request to visit an offender.[7] Former employees generally "shall not be allowed to visit an offender who has been housed in the same facility in which the ex-employee was employed and who was incarcerated at the facility during the time the ex-employee was employed there."[8] The superintendent of the facility reviews the ex-employee's "request and recommend[s] whether the visit is in the best interest of the facility and the individuals involved."[9] Absent special circumstances, an ex-employee must wait until one year after her employment has ended before she can visit an offender. However, ex-employees never are "permitted to visit an offender if the

---

[4] R.44-6 at 19.

[5] *Id.*

[6] *Id.*

[7] Because the WVCF and IDOC visitation policies are fundamentally the same with only minor stylistic differences, we discuss them in tandem.

[8] R.44-11 at 3.

[9] *Id.*

relationship between the offender and the ex-employee started or resulted from contact between the ex-employee and the offender during the ex-employee's period of employment with the Department."[10]

The Department also maintains a marriage policy, which "recognizes that marriage may serve as a rehabilitative tool which may assist an offender during the community re-entry process."[11] The policy states that "[t]he approval of an offender's request to marry shall be based upon the legality of the proposed marriage and the safety and security of the facility and the individuals involved."[12] Notably, the

---

[10] *Id.* The visitation policy also provides that if "an ex-employee has been terminated from employment or allowed to resign prior to termination, or during an investigation arising from a violation of department rules or procedures involving an offender, … the ex-employee shall be denied visitation privileges permanently from all department facilities." *Id.* at 4.

[11] R.44-7 at 1. The policy provides that a request to marry may be denied because:

>    A.  The offender is not legally eligible to marry;
>
>    B.  The offender is requesting to marry another offender;
>
>    C.  The offender is requesting to marry either a staff member or former staff member of the department; or,
>
>    D.  The requested marriage would endanger the safety and security of the facility, the department, the individuals involved or the public.

*Id.* at 4.

[12] *Id.* at 1.

Department did *not* reference its marriage policy when denying Ms. Riker's marriage application.

**B.**

In April 2013, Ms. Riker filed this action against several IDOC officials, including Bruce Lemmon in his official capacity as commissioner of the Department, challenging the denials of her requests to visit and to marry Vest. In due course, the defendants filed a motion for summary judgment. The officials submitted that the Department's refusal to permit Ms. Riker to marry Vest "did not violate [Ms.] Riker's qualified constitutional right to marry."[13] They contended that "the same security principles and concerns apply to the consideration of [Ms.] Riker's request for marriage as it does her request for visitation" and that allowing "[v]isitation between a former staff member and an offender that developed an inappropriate relationship during the course of the former staff member's employment inside the facility would threaten the security of the facility."[14] They maintained that, because Ms. "Riker was working inside the [WVCF] and was trained by the [IDOC] in security protocols, defense, and emergency security procedures," "[i]t was reasonable for [the prison officials] to conclude that [Ms. Riker] would know the security details of the [WVCF]" and that "a former staff person in a romantic relationship with an incarcerated individual might divulge

---

[13] R.45 at 24.

[14] *Id.* at 15, 26.

security information to that incarcerated individual or assist him in other inappropriate ways."[15]

The district court granted the defendants' motion. With respect to Ms. Riker's right-to-marry claim, the court concluded "that the burden on Ms. Riker's right to marry was not substantial or direct, but was light or at most moderate."[16] In support of its conclusion, "the [c]ourt note[d] that Ms. Riker ha[d] not made a formal request to marry Mr. Vest" and that "Ms. Riker ha[d] not been absolutely prevented from marrying a large portion of the eligible population of spouses."[17] The court then decided that "[a]llowing Ms. Riker, and other former employees, to visit inmates is a legitimate security risk" and that, under the rational-basis standard of scrutiny, it would "not second guess the security concerns expressed by the correctional authorities."[18]

Ms. Riker appeals only the district court's decision that the defendants did not unreasonably burden her constitutional right to marry.

---

[15] *Id.* at 16.

[16] R.62 at 13.

[17] *Id.*

[18] *Id.* at 14.

## II

## DISCUSSION

Ms. Riker contends that the Department's decision preventing her from marrying Vest is unconstitutional. She submits that prohibiting her marriage to Vest is an exaggerated response to the prison's security objectives and that the prohibition is unnecessary for the maintenance of a safe and orderly institution. She emphasizes that she seeks only "a single visit to the institution, of a short duration, for the limited purpose of marrying her fiancé."[19] She maintains that "[i]t is implausible to insist that this brief ceremony may not be accommodated without threatening institutional security and without imposing more than a *de minimis* impact on prison resources."[20]

We review a district court's decision granting summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party. *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law." *Id.*

### A.

### 1.

We begin by setting forth the overarching substantive principles that must guide our analysis. The Supreme Court

---

[19] Appellant's Br. 19; *accord* Reply Br. 1–2.

[20] Appellant's Br. 19–20.

has held "that federal courts must take cognizance of the valid constitutional claims of prison inmates. Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citation omitted). The Constitution protects a prisoner's fundamental right to marry; individuals do not lose this constitutional protection simply because they are imprisoned. *See id.* at 94–96; *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (recognizing that "[o]ver time and in other contexts, the Court has reiterated that the right to marry is fundamental under the Due Process Clause"). That protection, however, "is subject to substantial restrictions as a result of incarceration." *Turner*, 482 U.S. at 95.

Under the principles articulated by the Supreme Court, "a prison regulation [that] impinges on inmates' constitutional rights…is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Supreme Court repeatedly has reaffirmed this standard.[21] *See Florence v. Bd. of Chosen Freeholders of the Cty. of Burlington*, 132 S. Ct. 1510, 1515 (2012); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Washington v. Harper*, 494 U.S. 210, 223–24 (1990); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). Although Ms. Riker is not a prisoner, "so far as challenges to prison

---

[21] The parties agree that we must proceed under the analysis set forth in *Turner v. Safley*, 482 U.S. 78 (1987). The district court got off on the wrong foot when it did not realize that the Supreme Court has held squarely that when prisoners' rights or, as here, the rights of prisoners and outsiders are implicated, the proper analysis is found in *Turner*. *See Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003); *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989).

regulations as infringing constitutional rights are concerned, the standard is the same whether the rights of prisoners or of nonprisoners are at stake." *Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989)). In determining a regulation's reasonableness, we must balance the constitutional right asserted against the legitimate penological goals of the prison. *See Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011).

**2.**

The Supreme Court also has given us explicit guidance on the implementation of the substantive principles articulated in the cases that we have just discussed. It has identified four factors that we must consider in determining the reasonableness of a prison regulation that restricts the right to marry:

> (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question; (3) what impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources; and (4) what easy alternatives exist to the regulation because, although the regulation need not satisfy a least restrictive alternatives test, the existence of obvious

alternatives may be evidence that the regulation is not reasonable.[22]

---

[22] Although the language used by the Supreme Court in setting forth the reasonableness test appears similar to the "rational-basis test" used in other contexts, *see Vance v. Bradley*, 440 U.S. 93, 97 (1979) (noting "that the section is valid if it is rationally related to furthering a legitimate state interest" (internal quotation marks omitted)), the "reasonableness standard" applied in this context is more demanding, *see Thornburgh*, 490 U.S. at 414 ("We adopt the *Turner* standard in this case with confidence that, as petitioners here have asserted, a reasonableness standard is not toothless." (internal quotation marks omitted)). The test for whether a prison regulation impermissibly burdens a prisoner's constitutional rights requires a more searching inquiry into the justifications supporting the regulation. *Compare Turner*, 482 U.S. at 97–98 (noting that the regulation "represents an exaggerated response to such security objectives"), *with FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (noting that, under traditional rational-basis review, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it" (internal quotation marks omitted)). The court also must determine if there are alternative means of accommodating the prisoner's rights. *See Turner*, 482 U.S. at 90–91; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n.2 (1987) (noting that "the presence or absence of alternative accommodations of prisoners' rights is properly considered a factor in the reasonableness analysis rather than a basis for heightened scrutiny"). We also recognize, however, that the reasonableness "test is less restrictive than that ordinarily applied to infringements on constitutional rights in consideration of the need to give appropriate deference to prison officials, avoiding unnecessary judicial intrusion into security problems and other prison concerns." *Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011); *accord Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 136 (2d Cir. 2013) (noting that "[t]he standard adopted by the Supreme Court was a compromise between the strict scrutiny standard that usually would apply to such constitutional claims and the inordinately

(continued…)

*Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996) (citing *Turner*, 482 U.S. at 89–90); *accord Van Den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). Although all four factors are important, "the first one can act as a threshold factor regardless which way it cuts." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90. Although "the burden of persuasion is on the prisoner to disprove the validity of a regulation," prison officials "must still articulate their legitimate governmental interest in the regulation" and provide some evidence supporting their concern. *Van Den Bosch*, 658 F.3d at 786; *accord Mays v. Springborn*, 575 F.3d 643, 647 (7th Cir. 2009) (per curiam) ("Once the prison gave its explanation for denying the supplements, the burden shifted to Mays to present evidence to call that explanation into question."); *Shimer*, 100 F.3d at 509 ("The prison administration must proffer some evidence to support its restriction of prison guards' constitutional rights."); *see also Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) ("In order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals." (emphasis in original)). "The prison administration cannot avoid court scrutiny by reflexive, rote assertions." *Shimer*, 100 F.3d at 510 (internal quotation marks omitted). At the same time, we recognize that "[w]e must accord substantial

---

(…continued)

difficult undertaking of running a prison" (internal quotation marks omitted)).

deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Singer*, 593 F.3d at 534 (internal quotation marks omitted).

**3.**

Nor are we without precedent on the application of this methodology. In *Turner*, the Supreme Court applied the factors that it had articulated to hold that the challenged prison regulation, which permitted an inmate to marry only after the superintendent found a compelling reason to grant the prisoner permission, placed an unconstitutional burden on the prisoner's right to marry. *See* 482 U.S. at 96–99. There, the prison officials had provided two justifications for the regulation: "[t]he security concern…that 'love triangles' might lead to violent confrontations between inmates," and the rehabilitative goal of allowing women prisoners, who "often were subject to abuse at home or were overly dependent on male figures," to "develop[] skills of self-reliance." *Id.* at 97. The Court determined that the regulation was "not reasonably related to these penological interests." *Id.*

The Court explained that the regulation "represent[ed] an exaggerated response to [the state's] security objectives" and that there were "obvious, easy alternatives to the [challenged] regulation that accommodate[d] the right to marry while imposing a *de minimis* burden on the pursuit of security objectives." *Id.* at 97–98. The Court remarked that it

was "aware of no place in the record where prison officials testified that such ready alternatives would not fully satisfy their security concerns." *Id.* at 98.

The Court then decided that the "marriage restriction [was not] reasonably related to the articulated rehabilitation goal." *Id.* at 98. The Court pointedly noted the disparity between the prison administrators' justification for the prohibition and its application: the regulation swept "much more broadly than can be explained by petitioners' penological objectives." *Id.* at 98. Therefore, "the almost complete ban on the decision to marry [was] not reasonably related to legitimate penological objectives." *Id.* at 99.

We also have had occasion to address the contours of an inmate's right to marry. In *Keeney*, a prison regulation prohibited current employees from "becom[ing] involved socially with inmates in or out of the [jail]." *Keeney*, 57 F.3d at 580 (second alteration in original). The plaintiff, an employee at the correctional facility, claimed that by "forcing her to choose between her job and marriage to the man of her choice, the defendants infringed her constitutional right to marry." *Id.* We first noted that, "[a]s long as the concerns expressed by correctional authorities are plausible, and the burden that a challenged regulation of jail or prison security places on protected rights a light or moderate one, the courts should not interfere." *Id.* at 581. We then decided that the anti-fraternization rule at issue did not violate an individual's right to marry under the Fourteenth Amendment. *See id.* at 581–82. Our decision largely rested on the relatively minimal burden placed on the plaintiff's right to marry. The defendants had not forbidden the employee from marrying her fiancé; instead, they simply forbade her

from continuing to work in the prison system in which her spouse was incarcerated. *See id.* at 580–81. Preventing the transfer of unlawful communication between the inmate and others as well as preventing favored treatment, we explained, justified the minimal burden on the plaintiff's rights.[23] *See id.* at 581–82. Because the administrators had a reason clearly related to prison security, they could forbid the plaintiff's marrying the inmate and remaining a prison guard.

We also addressed a prisoner's right to marry in *Martin v. Snyder*, 329 F.3d 919 (7th Cir. 2003). There, we recognized that qualified immunity was appropriate when a prison official relied on the institution's visitation policy to *postpone* an inmate's marriage. In that case, an inmate was prohibited from marrying because his fiancée had been placed on a restricted list, which prevented her from visiting the prison. *See id.* at 920. The district court dismissed the inmate's complaint after concluding that there was no independent right to visitation. On appeal, we acknowledged that, after the district court had issued its decision, the inmate had been allowed to marry after a twelve-month deferral. *See id.* In explaining our conclusion that the deferment was not clearly unconstitutional, we noted that "[r]estrictions on visitation, *though not enough to justify prohibiting marriage*, may well justify deferment, so that the sanction for misconduct will have some sting." *Id.* at 922 (emphasis

---

[23] We noted that without the regulation prisoners would "have an enhanced incentive to 'romance' their female guards" and that "[j]ust the suspicion of favored treatment could create serious problems of morale." *Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995).

added). Because it was not clearly established "that a year's delay is unconstitutional when the prisoner's misbehavior has led to curtailment of visiting rights," we held that qualified immunity was appropriate. *Id.*

**B.**

Now that we have set forth the substantive principles that must control our decision and their application, we turn to the situation presented by the present case.

The defendants submit that the decision to deny Ms. Riker's request to marry Vest furthers the Department's "legitimate interest in maintaining security and institutional order."[24] They provide two security-related justifications for the decision: first, a former employee who previously violated Department policies is more likely to engage in other prohibited acts; and second, a former employee may share with an inmate confidential information obtained while employed at the prison.[25] The Department also

---

[24] Appellees' Br. 19.

[25] Specifically, the superintendent of the WVCF provided the following justifications for the ex-employee visitation policy:

> There are a number of security concerns associated with a former employee, including contractors and volunteers, visiting an offender that developed a relationship during the course of the former staff members' employment in the facility, including, but not limited to the following:
>
> > [1] A former staff member who willingly violated the DOC's express prohibition against
> > (continued…)

(…continued)

relationships with offenders, may engage in other prohibited acts detrimental to the safety and security of the facility and its staff if he/she were allowed to visit the offender in the facility (i.e. trafficking with an offender). The offender may have the ability to further influence or exploit former staff member [sic] by virtue of their relationship.

[2] A former staff member has been trained in a number of security matters which are not disclosed to offenders and members of the general public. That confidential security information could be communicated to the offender without the knowledge of custody staff if visits were permitted (Note that all incoming mail, email and phone calls with offenders are monitored and recorded for security).

[3] A former staff member may be aware of possible weaknesses in the security of his/her particular job area and the facility generally which could be shared with the offender if visits were permitted between the former staff member and the offender.

[4] A former staff member had access to confidential information such as confidential policies and procedures, emergency security procedures and confidential information contained in other offenders' packets, which could be shared if visits were permitted.

[5] The former staff member, by virtue of their former employment, may have gained knowledge regarding other staff members' personal information (such as home address,

(continued…)

maintains that because Ms. Riker is free to marry anyone but Vest, the prohibition imposes a minimal burden on Ms. Riker's right to marry.[26]

The latter argument can be dismissed quickly. The right to marry includes the right to select one's spouse. *See Obergefell*, 135 S. Ct. at 2599 (noting "that the right to personal choice regarding marriage is inherent in the concept of individual autonomy" and that there is dignity in individuals' "autonomy to make such profound choices").[27]

---

(…continued)

> personal phone number, names of family members), which could be communicated to the offender, placing staff and staff family members at risk.

R.44-2 at 2–3; *accord* Appellees' Br. 9–11 (citing R.44-2 at 2–3).

[26] The Department similarly contends that Ms. Riker's ability to marry Vest has not been prohibited; instead, the marriage "has been effectively deferred" until Vest is released in 2030. Appellees' Br. 28. Waiting until Vest's release, however, is not a realistic alternative to allowing Ms. Riker to exercise her right to marry. *Cf. Martin v. Snyder*, 329 F.3d 919, 922 (7th Cir. 2003) (holding that a *one-year* deferment of an inmate's marriage was not clearly unconstitutional). Many (but not all) prisoners someday will be released. That eventuality does not permit prison officials to deprive an inmate of their constitutional rights in the interim. To hold otherwise would extinguish an inmate's constitutional right to marry and render futile the analysis set forth in *Turner*. *See Turner*, 482 U.S. at 90 (noting that the appropriate analysis considers "whether there are alternative means of exercising the [constitutional] right that remain open to prison inmates").

[27] *See also Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990) (plurality opinion) ("[T]he regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be

(continued…)

The proper inquiry, therefore, is whether Ms. Riker was prohibited from marrying the spouse of her choosing. Because Ms. Riker has not been left with any alternative means of exercising her right to marry Vest, it is clear that the burden on that right was not minimal. *Cf. Turner*, 482 U.S. at 90 (explaining that **"**where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials…in gauging the validity of the regulation" (alteration in original) (citation omitted) (internal quotation marks omitted)).

We next must decide whether the Department has established that its decision barring Ms. Riker from marrying Vest was reasonably related to its legitimate penological interests. The fundamental infirmity with the Department's position is that it equates Ms. Riker's one-time request to enter the prison to participate in a marriage ceremony with a request for general visitation rights. The Department's decision to forbid Ms. Riker's marriage is premised entirely on its ex-employee visitation policy and the security

---

(…continued)

predicated on legitimate state concerns other than disagreement with the choice the individual has made."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse.…"); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684–85 (1977) ("[A]mong the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage…." (internal quotation marks omitted)); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State.").

justifications that support that policy. At bottom, it maintains that any effect on Ms. Riker's right to marry simply is incidental to the application of its visitation policy.[28] Nothing in the record, however, supports equating general visitation with a single marriage ceremony, and we previously have indicated that a prison's visitation policy, on its own, does not justify prohibiting an inmate's

---

[28] The Department fundamentally misconceives the issue before the court. It contends that "[a]t issue here is the IDOC's application of its policy preventing Ms. Riker, an ex-employee of an IDOC contractor who worked the WVCF, from visiting Mr. Vest, who is incarcerated at the WVCF, because their relationship began while Ms. Riker was employed through the IDOC." Appellees' Br. 15; *see also id.* at 15 (stating that "[a] necessary extension of the IDOC's visitation policy is the IDOC administrators' decision denying Ms. Riker's request to marry Mr. Vest"); *id.* at 21 (noting that "WVCF administrators identified a number of security-related issues that could arise if former employees were *allowed to visit* an offender with whom she or he developed a relationship at the same facility where she worked" (emphasis added)); *id.* at 22 (noting that "[c]ourts have consistently upheld similar limitations on *visitation* by former staff to correctional institutions" (emphasis added)); *id.* at 25 (noting that "the consequence of [Ms. Riker's prior] violation warrants the existence and the application of the *visitation* policy" (emphasis added)). Instead, we must consider whether the Department's decision preventing Ms. Riker from marrying Vest was justified.

In accordance with its position, the Department relies entirely on the deposition testimony of the WVCF superintendent, which focused on the WVCF's visitation policy. *See supra* note 25. It also relies on cases such as *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460 (1989), and *Bilka v. Farrey*, 447 Fed. App'x 742, 744 (7th Cir. 2011), which addressed the denial of visitation rights. Because we must focus on the Department's decision to prevent Ms. Riker from marrying, the Department's reliance on those cases is misplaced.

marriage. *See Martin*, 329 F.3d at 922 (noting that "[r]estrictions on visitation[ are] not enough to justify prohibiting marriage").

The Department also submits that the prohibition of Ms. Riker's marriage is necessary to serve as a deterrent to current employees. It submits that "[t]he policy communicates to IDOC employees that if they begin an inappropriate relationship with an offender while working at an IDOC facility, they will not only be held accountable but also will be prevented from seeing the inmate for as long as he or she is incarcerated."[29] The Department has not provided any evidence, however, to support its contention that prohibiting Ms. Riker's marriage acts as a deterrent or that such deterrence is necessary.

The Department does not otherwise contend that prohibiting Ms. Riker's marriage satisfies the test set forth in *Turner*. It fails to explain why allowing Ms. Riker to marry Vest would pose a security risk or how preventing her marriage furthers its security interests.[30] There is no evidence in the record supporting the Department's contention that prohibiting Ms. Riker's marriage is necessary to ensure a

---

[29] Appellees' Br. 25.

[30] The Department maintains that we "must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and determining the most appropriate means to accomplish them." *Id.* at 17 (quoting *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)). Although we agree with that general proposition, the Department has not demonstrated that WVCF officials used their professional judgment specifically to deny Ms. Riker's marriage request.

safe and orderly institution. Our case law is clear that the invocation of a general security interest, standing alone, is insufficient to support the Department's decision. *See Shimer*, 100 F.3d at 510 (refusing to accept prison administration's rote assertions and noting that we were "reduced to speculation when not provided with evidence, and, having speculated, find it difficult to establish a connection between the prison administration's unsubstantiated justifications and its policy"). To satisfy its burden, the Department must present evidence demonstrating a specific security concern that bears a nexus to the prohibited conduct, here, Ms. Riker's marriage ceremony. The Department has failed to provide such evidence. Thus, at this juncture, the Department has not established that its decision prohibiting Ms. Riker's marriage has a logical connection to its security concerns.

Notably, the record does not reveal why prison officials would have difficulty monitoring the marriage ceremony to ensure that Ms. Riker does not violate prison regulations or relay sensitive information to Vest. *See Turner*, 482 U.S. at 90 (noting that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable"). The Department offers no explanation for why it could not permit Ms. Riker's marriage request while simultaneously maintaining a secure facility. It is implausible to suggest, without some supporting evidence, that a brief marriage ceremony cannot be accommodated without threatening institutional security and without imposing more than a de minimis impact on prison resources. Indeed, Ms. Riker submits that the ceremony would "last but a brief few

minutes in a highly regulated setting."[31] The Department does not offer testimony or other evidence to refute Ms. Riker's claim. *See id.* at 98 (noting that the Court was "aware of no place in the record where prison officials testified that such ready alternatives would not fully satisfy their security concerns"). Here, as in *Turner*, there may well be "obvious, easy alternatives to the [prohibition of Ms. Riker's marriage ceremony] that accommodate the right to marry while imposing a *de minimis* burden on the pursuit of security objectives." *Id.*

Absent significantly more evidence explaining the importance of banning Ms. Riker's marriage, *Turner* does not allow us to accept at face value the Department's unsubstantiated contentions. The Department therefore has not established that it is entitled to summary judgment.

## Conclusion

The district court erred in granting the Department's motion for summary judgment and concluding that the Department's denial of Ms. Riker's request for a brief, one-time visit in order to participate in a marriage ceremony did not violate her constitutional right to marry. The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion. Ms. Riker may recover the costs of this appeal.

REVERSED AND REMANDED

---

[31] Appellant's Br. 21.