In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1618

PAUL NIGL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

JON LITSCHER, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 17-cv-925 — **J. P. Stadtmueller**, *Judge*.

ARGUED SEPTEMBER 17, 2019 — DECIDED OCTOBER 7, 2019

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Wisconsin Department of Corrections officials denied inmate Paul Nigl's request to marry his former prison psychologist, Dr. Sandra Johnston. Nigl and Johnston filed suit, arguing that the denial violates their fundamental right to marry. The denial, however, was reasonably related to legitimate penological interests. Nigl and Johnston had engaged in a pattern of rule-breaking and deception in furtherance of their relationship leading up to the date of

the marriage request, and the Psychology Examining Board concluded that Johnston had violated rules designed to protect patients in connection with her relationship with Nigl. The defendants also represent that the decision to deny the marriage request in January 2017 is not tantamount to a permanent denial. We therefore affirm the district court's entry of summary judgment for the defendants.

## I. Background

Since 2001, plaintiff-appellant John Nigl has been a prisoner within the Wisconsin Department of Corrections ("Department"), where he is currently serving a 100-year bifurcated sentence for two counts of intoxicated homicide by use of a vehicle. From 2001 until September 2015, Nigl was incarcerated at Waupun Correction Institution ("Waupon"). Plaintiff-appellant Dr. Sandra Johnston worked at Waupon as a prison psychologist from April 2013 until January 2015, during which time she provided psychological services to Nigl and had numerous contacts with him. On Johnston's last day of work at Waupon, Nigl kissed her.[1]

After Johnston's last day at Waupon, Nigl asked his brother to find Johnston's contact information. Johnston and Nigl then began communicating regularly by mail, email, and phone and became engaged in April 2015.

Johnston returned to employment with the Department as a psychologist in the Department's central office in July 2015. On her first day of work, she submitted a "fraternization policy exception request" form to her supervisor, requesting permission to have contact with Nigl. Where the form asks for

---

[1] Johnston initially admitted to kissing Nigl but later denied it.

the "Nature of Employee Relationship to Offender," Johnston checked the box marked "other" and wrote "Met at [Waupon] approximately 04/13. Relationship [is] professional." Johnston did not disclose that she was engaged to Nigl or that she was otherwise in a romantic relationship with him. Johnston's supervisor never processed the fraternization policy exception request, but Nigl and Johnston continued to have contact anyway. Because Johnston's fraternization request had not been approved, those contacts were a violation of the Department's fraternization policy, which prohibits Department employees from having "personal contacts … [and] knowingly forming close relationships" with inmates. The Department's fraternization policy "is designed to eliminate any potential conflict of interest or impairment of the supervision and rehabilitation" that Department employees provide inmates.

Around the same time that Nigl was transferred to Redgranite Correctional Institution ("Redgranite") in September 2015, the Department learned about Johnston's relationship with Nigl. The Department then terminated Johnston in October 2015 for violations of the Department's fraternization policy.

A month after Johnston was terminated, she requested to visit Nigl. She disclosed on the visitation request form that she was Nigl's "friend" but did not disclose any romantic relationship with Nigl. Johnston noted that the details of how they met were confidential under the Health Insurance Portability and Accountability Act. Department personnel denied Johnston's request pursuant to Wis. Admin. Code § DOC 309.08(4)(j) because she had been an employee of the Department less than twelve months earlier.

In ensuing investigations of Johnston's conduct, Redgranite staff found cards, letters, and photographs from Johnston in Nigl's cell, some of which were sent under the alias "Cassie Fox" or "Cass." Some of the photographs depicted Johnston in various stages of undress and in sexually suggestive poses. The parties dispute whether Johnston sent Nigl these items while employed by the Department. Defendant-appellee Michael Meisner, warden of Redgranite, testified that if Johnston sent the items while employed by the Department, then those items would be considered contraband.

Johnston had also set up an account with the prison's phone system under the name Cassie Fox and engaged in phone sex with Nigl. The Department prohibits using an alias when communicating with an inmate because it thwarts the effective monitoring of inmate communications. Meisner believed that Johnston used the alias to conceal her identity as a former Department employee and to thwart the security protocol of the institution.

The Department reported Johnston's relationship with Nigl to the Psychology Examining Board (the "Board"). The Board concluded that Johnston, in furtherance of her relationship with Nigl, had violated Wis. Admin. Code §§ Psy 5.01(14)(a) and (b), which prohibit licensed psychologists from "[e]ngaging in sexual contact, sexual conduct, kissing, or any other behavior which could reasonably be construed as seductive, romantic, harassing, or exploitative" with a client or former client within two years of the end of professional services. The Board's rules aim to "protect the health, safety or welfare of clients or patients." *Bar-Av v. Psychology Examining Bd.*, 728 N.W.2d 722, 728 (Wis. Ct. App. 2007). As a result of the Board's findings, it entered an order in August

2016 suspending Johnston's license for one year and limiting her license to practice.

In November 2016, Johnston submitted another request to visit Nigl. She again indicated that she was Nigl's friend but did not disclose a romantic relationship with him. Department personnel also denied that request because, among other reasons, she had shown a willingness to violate rules by communicating with Nigl outside of her professional relationship.

In December 2016, Nigl requested permission to marry Johnston. Under the Department's policies and procedures, an inmate could submit a request to marry if the following conditions were met:

A. The marriage does not pose a threat to the security of the facility or a threat to the safety of the public;

B. There are no legal impediments to the marriage;

C. The inmate is not scheduled for release within nine months;

D. The proposed spouse or the proposed spouse's children are not victims of the inmate;

E. The proposed spouse has never been convicted in any criminal activity with the inmate; and

F. The proposed spouse has been on the inmate's visiting list for a minimum of one year or is able to demonstrate a longstanding relationship with the proposed spouse.

The decision to approve or deny the request falls within the warden's discretion. The parties agree that the Department could accommodate a brief ceremony without compromising prison security or placing undue strain on prison resources.

Defendant-appellee Sara Hungerford, who was a social worker at Redgranite at the time, received and reviewed the marriage request. Hungerford conferred with her supervisor defendant-appellee Zachary Schroeder and recommended denial of the request to marry because

> there are reasonable grounds to believe the marriage poses a threat to the security of the facility or a threat to the safety of the public, or threatens other legitimate penological interests … [and the] proposed spouse has not been on the visiting list for at least one year and is not able to demonstrate a longstanding relationship.

Schroeder and Meisner agreed with Hungerford's recommendation because of Johnston and Nigl's violations of Department rules in furtherance of their relationship; Johnston's violations of the code of professional conduct for psychologists and, relatedly, Meisner's concern that Johnston may have victimized Nigl; Meisner's belief that the relationship was grounded in deception and rule-breaking; Nigl and Johnston's failure to demonstrate a longstanding relationship; and the threat the marriage would pose to the security of the facility and other penological interests. Meisner made the final decision to deny Nigl's request to marry Johnston in January 2017.

Nigl submitted two inmate grievances about the marriage denial in early 2017. The inmate complaint examiner recommended denial of the grievances, finding that the staff acted in accordance with Department policy. Nigl appealed the denials of his grievances, and those appeals were also denied. Jon Litscher was the Department Secretary and final decision-maker on internal inmate grievances at the time the grievances and appeals were denied. Defendant-appellee Kevin Carr is the current Department Secretary and is substituted for former Secretary Litscher pursuant to Fed. R. App. P. 43(c)(2).

In June 2017, Johnston submitted a third visitation request, again stating that Nigl was a "friend" but declining to disclose their romantic relationship. The request was denied for reasons similar to the reasons the previous visitation requests were denied. Since June 2018, Nigl has been housed at Fox Lake Correctional Institution ("Fox Lake").

Nigl and Johnston filed suit under 42 U.S.C. § 1983 based on the denials of the marriage and visitation requests. The parties filed cross-motions for summary judgment, and the district court granted the defendants' motion, dismissing all claims as to all parties. The district court concluded that the denial of the marriage request was "reasonably related to [the defendants'] goal of ensuring a secure prison where staff and inmates respect the rules." The plaintiffs appeal the district court's judgment only as to the denial of the marriage request.

The plaintiffs argue that the district court misapplied the four-factor test the Supreme Court set forth in *Turner v. Safley*, 482 U.S. 78 (1987) when evaluating the plaintiffs' right to marry claim because it relied solely on the first factor and ignored the others. The plaintiffs also argue that the district

court's decision conflicts with this Court's precedent in *Riker v. Lemmon*, 798 F.3d 546 (7th Cir. 2015), a case where we held that the defendants had not adequately justified their denial of an inmate's marriage request. The defendants respond that the district court correctly concluded that the denial of the marriage request was reasonably related to legitimate penological interests in institutional security and inmate rehabilitation.

## II. Discussion

We review de novo the district court's entry of summary judgment and consider the record in the light most favorable to the plaintiffs, the party against whom summary judgment was entered here. *Pagel v. TIN Inc.*, 695 F.3d 622, 624 (7th Cir. 2012). The district court's entry of summary judgment for the defendants was proper only if no material issue of fact exists that would allow a jury to find in favor of the plaintiffs. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).

### A. Prisoners' Right to Marry

Prisoners retain, under the Fourteenth Amendment, a constitutional right to marry, which "like many other rights, is subject to substantial restrictions as a result of incarceration." *Turner v. Safley*, 482 U.S. 78, 95 (1987). A prison policy decision that impinges on an inmate's constitutional rights does not violate the Constitution if the decision "is reasonably related to legitimate penological interests." *Id.* at 89; *see also Siddiqi v. Leak*, 880 F.2d 904, 909 (7th Cir. 1989) (*Turner* test applies to

prison policy decisions as well as prison regulations).[2] The Supreme Court has set forth four factors for the Court to consider in making this determination:

>    (1) whether there was a rational connection between the decision to deny the marriage request and the legitimate penological interest put forward to justify the denial;
>    (2) whether alternative means of exercising the right remained open to the plaintiffs;
>    (3) what impact accommodation of the asserted right would have on guards and other inmates; and
>    (4) whether obvious, easy alternatives existed to accommodate the plaintiffs' rights at de minimis cost to valid penological interests, tending to show that the denial was an exaggerated response to prison concerns.

*Turner*, 482 U.S. at 89–91. The defendants argue that the case can be disposed of under the first factor whereas the plaintiffs argue that the Court must consider the first and fourth factors.[3] Although "the first one can act as a threshold factor regardless of which way it cuts," *Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015) (citation omitted), the ultimate question remains whether the defendants' decision to deny the marriage

---

[2] The standard is the same for both Nigl and Johnston. *See Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995) ("[S]o far as challenges to prison regulations as infringing constitutional rights are concerned, the standard is the same whether the rights of prisoners or of nonprisoners are at stake.") (citation omitted).

[3] The parties agree that the defendants cannot justify their denial of the marriage request based on the second or third factors.

request was reasonably related to legitimate penological interests, *Turner*, 482 U.S. at 89.

Courts must give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). The defendants cannot, however, "avoid court scrutiny by reflexive, rote assertions." *Riker*, 798 F.3d at 553 (citation omitted). "Although the burden of persuasion is on the prisoner to disprove the validity of a regulation, prison officials must still articulate their legitimate governmental interest in the regulation and provide some evidence supporting their concern." *Id.* (citation and internal quotation marks omitted).

## B. Denial of Plaintiffs' Marriage Request

The defendants' denial of the plaintiffs' one-time marriage request in January 2017 was reasonably related to their legitimate penological interests in preserving the security of the prison, inducing compliance with and promoting respect for the prison's rules governing inmate contacts, and rehabilitating Nigl. The defendants have pointed to several instances of misconduct by Johnston and Nigl in furtherance of their relationship: Johnston and Nigl kissing on Johnston's last day at Waupon (a fact that Johnston now denies); Johnston and Nigl developing and continuing their relationship in violation of Department rules; Johnston using an alias to communicate with Nigl; Johnston continuing to have contact with Nigl even though her fraternization policy exception request had not been approved; Johnston misrepresenting her relationship as

merely "professional" and stating that she was only a "friend" of Nigl on fraternization policy exception and visitation forms; and Johnston having violated professional rules meant to protect clients or patients like Nigl by engaging in seductive, romantic, or exploitative conduct with him.

The plaintiffs' pattern of rule-breaking and deception in furtherance of their relationship continued up to and through the date of the marriage request. As recently as one month before the marriage request, Johnston falsely identified herself as merely Nigl's "friend," and she again identified herself as merely a friend on a visitation request form after Nigl submitted the marriage request. Considering these continued failures to disclose the true nature of their relationship in the context of the previous uses of an alias and other forms of deception, the defendants could have reasonably concluded that the couple's pattern of rule-breaking and deception was ongoing through the time of the marriage request.

Taking steps to prevent this kind of conduct from recurring in the future is rationally related to the defendants' interests in maintaining a secure prison capable of effectively monitoring inmate contacts and in promoting respect for its rules. Requiring the defendants to grant the plaintiffs' marriage request at a time when the plaintiffs were engaged in an ongoing pattern of rule-breaking and deception in furtherance of their relationship would eliminate or reduce the "sting" from the Department's sanction for the plaintiffs' misconduct. *Cf. Martin v. Snyder*, 329 F.3d 919, 922 (7th Cir. 2003) ("Restrictions on visitation, though not enough to justify prohibiting marriage, may well justify deferment, so that the sanction for misconduct will have some sting.").

Moreover, sanctioning the plaintiffs for misconduct to promote respect for the prison's rules was not the only reason for denying the marriage request. The defendants also denied the request because of Meisner's concern that Johnston, given her position of authority over Nigl, may have been exploiting or otherwise victimizing Nigl. That concern is supported by the Psychology Examining Board's finding, published just four months before the marriage request, that Johnston violated rules designed to protect psychologists' clients and patients.[4] The denial of the marriage request was therefore rationally related to the defendants' goal of protecting Nigl from the same exploitation that those rules were designed to prevent.

At the time of the marriage request, Johnston was already not permitted to visit Nigl. The plaintiffs assert that the defendants still could have segregated Nigl or restricted his phone privileges as punishment for the rule violations instead of denying the marriage request. The *Turner* test, however, is not a least restrictive alternative test, 482 U.S. at 90, and the defendants are entitled to "substantial deference" in determining the most effective means to accomplish their legitimate penological goals, *Overton*, 539 U.S. at 132. The plaintiffs have not made any showing that either one of their proposed

---

[4] The plaintiffs concede that Johnston provided psychological services to Nigl and had a professional relationship with him. Johnston also wrote on a Department form that the details of how she met Nigl were protected by the Health Insurance Portability and Accountability Act, which safeguards medical information. The plaintiffs nevertheless dispute the characterization of Nigl as Johnston's former "patient." Regardless of how the relationship is labeled, the Board concluded that Johnston, a licensed psychologist, violated rules designed to protect clients and patients in connection with her relationship with Nigl.

alternative means was "obvious [and] easy," *Turner*, 482 U.S. at 90, or could have been substituted at only de minimis cost to the defendants' pursuit of their legitimate penological goals, *id.* at 90–91; *see also Overton*, 539 U.S. at 132 (prisoners bear burden to prove invalidity of prison regulations).

The plaintiffs rely heavily on our decision in *Riker*, but the marriage request issue in that case was decided based on a "fundamental infirmity" that does not exist here. 798 F.3d at 556. The fundamental infirmity, we explained, was that the justification the defendants offered for denying the marriage request was "premised entirely on its ex-employee visitation policy and the security justifications that support that policy." *Id.* at 556 & n.28 (explaining that the Department "fundamentally misconceive[d] the issue before the court" by resting justifications for the denial of the marriage request on reasons for denying visitation privileges). Here, the defendants have articulated reasons for the denial of the marriage request that exist independently of concerns surrounding visitation.

It is worth clarifying that before this Court is the January 2017 denial of the plaintiffs' request to get married. The defendants readily concede that the denial was a one-time rather than permanent denial; that the decision was made, in part, because of the temporal proximity between the rule-breaking and the request; and that the plaintiffs are welcome to submit a new marriage request at Fox Lake, Nigl's new place of incarceration. While it would weigh on the Court's balancing of the *Turner* factors if this were a de facto permanent ban, *see, e.g., Beard v. Banks*, 548 U.S. 521, 535 (2006); *Overton*, 539 U.S. at 134, "*Turner* does not say that every delay violates the Constitution," *Martin*, 329 F.3d at 922. Under the circumstances

relevant to the one-time denial of the marriage request in January 2017, the logical connection between the denial and the asserted penological interests was not "so remote as to render the [decision] arbitrary or irrational," nor was the denial an "exaggerated response" to concerns regarding the plaintiffs' pattern of misconduct, rule-breaking, and deception in furtherance of their relationship. *Turner*, 482 U.S. at 89–90.[5]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[5] The Court need not reach, and does not address, issues of qualified immunity, standing, or mootness.