NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 20, 2021[*]
Decided April 21, 2021

**Before**

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 20-3112

| | |
|---|---|
| SANDRA K. NIGL, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Western District of |
| | Wisconsin. |
| | |
| *v.* | No. 18-cv-882-bbc |
| | |
| CATHY JESS, et al., | Barbara B. Crabb, |
| *Defendants-Appellees*. | *Judge*. |

**O R D E R**

Sandra Nigl, a former psychologist, lost her job at the Wisconsin Department of Corrections and her license to practice after she became romantically involved with inmate Paul Nigl, who was her patient and is now her husband. This is her second suit arising from her relationship with Paul. In the first, we considered their right to marry. *Nigl v. Litscher*, 940 F.3d 329 (7th Cir. 2019). Now, she argues that her discharge and

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. *See* FED. R. APP. P. 34(a)(2)(C).

license suspension violated her rights to intimate association and procedural due process. Because legitimate interests in prison security and patient protection justified the firing and suspension, we affirm summary judgment for the defendants.

Sandra treated Paul between May 2013 and January 2015, after which their relationship turned romantic. As a psychologist at Waupun Correctional Institution in Wisconsin, where Paul was housed, she kept notes of her therapeutic methods for treating him. She treated him for eight months; their relationship became romantic in January 2015, shortly after she left for a new job. At their final meeting before Sandra left Waupun, Paul tried to kiss her. She says that she rebuffed him at first, but less than a week later, he sent her a letter seeking a romantic relationship, and she accepted. They corresponded by mail and phone, with Sandra often using a fake name. By the end of February, they had confessed their mutual love and engaged in phone sex. In May, Sandra accepted Paul's proposal to enter a "Hebrew marriage covenant."

Sandra and Paul were romantically involved when she rejoined the Department several months later, in July 2015. She worked as a psychologist implementing the Prison Rape Elimination Act, 34 U.S.C. §§ 30301–09. Her duties included training staff about the Act, including its prohibition on inmate-staff relationships. In addition to that prohibition, the Department has its own anti-fraternization policy. It forbids employees from "[h]aving personal contacts or being in a social or physical relationship" with inmates, including "dating" and "corresponding or communicating." Prohibited conduct also includes "conversations or correspondence which suggests a romantic or sexual relationship." Violations can lead to discharge. On her first day, Sandra sought an exemption from the policy, describing her relationship with Paul as "professional." She withheld that they were in love and planned to marry. Sandra's supervisor did not accept the request; nonetheless, she carried on with the romance.

A few months later, an administrator at the Department, Catherine Jess, caught wind of the affair and launched an investigation. Sandra admitted that she and Paul were in "a courtship." A search of Paul's prison cell revealed that she had sent him letters and photos with romantic and sexual content, and phone logs and recordings of their calls showed that they talked regularly, often about their romantic and sexual desires. Jess concluded that Sandra was knowingly pursuing an unauthorized romantic relationship with a prisoner in violation of the anti-fraternization policy and in conflict with her job duties. Such relationships, Jess tells us, threaten security: Employees have access to confidential information about security measures that they could (wittingly or unwittingly) disclose to their inmate paramours; inmate-therapist relationships can

impair prison-therapy programs; and, in Sandra's case, the relationship undermined her ability to be a credible trainer on the Prison Rape Elimination Act. As a result, Jess fired Sandra.

The Department of Corrections also reported Sandra to Wisconsin's licensing authority, the Department of Safety and Professional Services. That authority began its own investigation into whether she had violated Wis. Admin. Code § PSY 5.01(14), which prohibits psychologists from having sexual or romantic encounters with clients within two years of a professional relationship. She told an investigator that she had provided "a form of therapy" to Paul before starting their romantic and sexual relationship. But she did not believe that she had breached the bar on non-professional relationships because she and Paul never had physical sex, Paul was not mentally ill, and, in her view, he was never her mental-health client. At her interview, Sandra was not permitted to bring a witness, she did not have counsel, and she had no advance access to documents. At the end of the interview, the investigator explained that, based on her admissions, Sandra likely faced a two-year license suspension.

The licensing authority's prosecuting attorney decided that Sandra's actions warranted discipline. The attorney proposed that, in lieu of formal charges and a public hearing, Sandra could stipulate to wrongdoing and accept a one-year suspension of her psychologist's license. The proposed stipulation stated that Paul was Sandra's client, that she treated him shortly before beginning their romantic relationship, that the relationship was unprofessional and violated § PSY 5.01(14), and that Sandra waived her rights to a hearing and an appeal. Sandra was informed of her right to consult an attorney before signing the stipulation. She declined to do so, believing that she lacked the money to hire one. She signed the stipulation but wrote that she felt "forced into this impossible position," given that her only other option was a hearing that she thought would be unfair and a waste of time and money. The licensing authority accepted the stipulation and suspended Sandra's license for one year. (Another complaint from the Department of Corrections to the licensing authority about Sandra, filed five months later after Paul's first request to marry her, was closed for lack of evidence.)

In this lawsuit, Sandra has sued employees of the Department of Corrections and the licensing authority, raising three sets of claims under 42 U.S.C. § 1983. First, she contends that they violated her Fourteenth Amendment right to intimate association by firing her and suspending her license. Second, she maintains that the licensing authority suspended her license without due process by denying her an attorney at her interview, by not giving her advance access to the evidence against her, and by pressuring her into

signing the stipulation. Third, she asserts that the Department's employees who lodged complaints about her with the licensing authority retaliated against her for exercising her constitutional right of association.

The district court granted the defendants' motions for summary judgment. It concluded Sandra's firing and suspension were reasonably related to legitimate interests in security, rehabilitation, and patient protection. It also ruled that she received sufficient due process during the suspension proceedings. And, it continued, Sandra presented no evidence that the Department employees who filed complaints with the licensing authority acted with any forbidden motive. Finally, all the defendants were entitled to qualified immunity (an issue that we do not need to reach).

On appeal, Sandra first argues that the district court wrongly granted summary judgment on her claim that her firing was unconstitutional. The parties stipulate that, under the substantive component of the due process clause of the Fourteenth Amendment, Sandra and Paul had a fundamental right to associate intimately. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617–620 (1984); *Christensen v. Cty. of Boone, Ill.*, 483 F.3d 454, 462–463 (7th Cir. 2007). But that right is "subject to substantial restrictions as a result of incarceration." *Nigl*, 940 F.3d at 333 (quoting *Turner v. Safley*, 482 U.S. 78, 95 (1987)). Such restrictions are valid if they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. That assessment turns on (1) whether the restriction and its proffered penological interest are rationally connected; (2) whether other means of exercising the right remain open; (3) the impact on the prison of accommodating the right; and (4) whether the prison's action was an exaggerated response because it had obvious, easy, and low-cost alternatives for accommodating the plaintiff's right and the prison's interests. *Nigl*, 940 F.3d at 333 (citing *Turner*, 482 U.S. at 89–91). Prison officials receive "substantial deference" in "defining the legitimate goals of a corrections system and . . . determining the most appropriate means to accomplish them.*" Id.* at 334.

The first factor indisputably favors the Department. It put forth a legitimate penological goal—prison security. And the Department rationally connected that goal to Sandra's firing for violating the anti-fraternization policy. As the Department plausibly tells us, non-enforcement of the policy risks leaks of confidential information, ineffective therapy, and a weakened workforce. *See Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995). Sandra faults the Department for not presenting more evidence of its security rationale, but once it provided some evidence, the burden shifted to her to contradict it, and she did not. *See Mays v. Springborn*, 575 F.3d 643, 647 (7th Cir. 2009). Instead, she

argued that the Department has at times, in its discretion, granted exemptions for other inmate-staff relationships. But it is undisputed that in those cases, unlike Sandra's, the recipients met outside of the correctional system, and thus those relationships did not create a risk of prisoners trying to "romance" staff to gain information or preferential treatment.

Defendants can prevail based on the first *Turner* factor alone, *see Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015), but the others fully favor the Department. The anti-fraternization policy did not pose, as Sandra says, an "absolute barrier" to a relationship with Paul. Their relationship continued after her job ended, and they are now married. *See Keeney*, 57 F.3d at 581. On the third factor, Sandra argues that the Department could simply assign her and Paul to different facilities. But that would not negate the risk of leaked confidential information (because Sandra's job required her to visit all facilities) or ensure effective therapy (because inmates might resist therapy if therapists could woo their patients). Last, under the fourth factor, Sandra mistakenly contends that, because she sought an exemption, her firing was an "exaggerated response." But she broke the rules: her exemption request, which was never granted, did not by itself authorize the relationship and, in her request, Sandra lied by describing her relationship as "professional." Further, in Sandra's first suit against the Department, we recounted the couple's "pattern of rule-breaking and deception" and said: "Taking steps to prevent this kind of conduct from recurring in the future is rationally related to the defendants' interests in maintaining a secure prison capable of . . . promoting respect for its rules." *Nigl*, 940 F.3d at 334–35. Accordingly, the discharge was constitutional.

Sandra raises another argument about her discharge. She contends that, in firing her, the Department did not follow state regulations, which she believes required first applying progressive discipline or identifying disciplinary comparators. *See* WIS. STAT. § 230.34(1)(a) (vers. eff. Jul. 14, 2015 to Jun. 30, 2016); *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020). But a violation of state law does not violate the federal constitution. *See Wells v. Caudill*, 967 F.3d 598, 602 (7th Cir. 2020). And, in any event, as a project employee without permanent status, the progressive discipline protections did not apply to her. § 230.34(1)(a) (employees "with permanent status" can only be removed for just cause). Even the version that she relies on did not require progressive discipline before firing her. § 230.34(1)(a) (vers. eff. Jan. 25, 2014 to Jul. 13, 2015).

Sandra has one final claim against the Department. She contends that it lodged complaints about her with the licensing authority to retaliate against her for exercising her constitutional right of association. The district court correctly entered summary

judgment on this claim because, at the time it reported Sandra, the Department had ample reason to believe that she violated § PSY 5.01(14). So its actions were reasonably related to the legitimate government interest in enforcing that regulation. Sandra's unsupported speculation about a retaliatory motive was insufficient to survive summary judgment. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017).

We now turn to Sandra's claims against the licensing authority. She first argues summary judgment was improper on her claim that it violated her right to intimate association, because, in her view, Paul was never her client, so it had no legitimate reason to discipline her. But as Sandra concedes, the goal of the rule barring psychologists from dating clients within two years of treatment is to promote the state's legitimate interest in "protect[ing] the health, safety or welfare of clients." *Nigl*, 940 F.3d at 331 (noting the purpose of § PSY 5.01(14)). Because the rule's goal is not to block intimate relations outright, its enforcement needs only to have a rational basis. *See Zablocki v. Redhail*, 434 U.S. 374, 386 (1978); *Montgomery v. Stefaniak*, 410 F.3d 933, 938 (7th Cir. 2005). And here the licensing authority had ample rationale to enforce its rule. Despite Sandra's protestations now, when it suspended her the authority had abundant evidence that Paul had been her client within two years of their romance. It had her treatment notes, her admission that she provided him "a form of therapy," her stipulation that she had treated him, and her confession of their mutual love. Based on this evidence, and the authority's legitimate regulation prohibiting romances within two years of therapy, Sandra's suspension was rational and thus constitutional.

Finally, Sandra revisits her claim about due process. She contends that the licensing authority violated her right to due process by coercing her into signing the stipulation. The coercion, she says, arose from her lack of an attorney and a chance to review the evidence, and the investigator's remarks that her actions would likely result in a two-year suspension. But the district court correctly ruled that these facts do not suggest a due process violation. First, the licensing authority never denied her access to counsel; rather, she decided not to retain a lawyer because of the cost. Sandra replies that, when the investigator told her not to bring any witnesses to the interview, she thought that was a denial of counsel. Even if her interpretation were reasonable, she had no right to counsel, or to review the evidence against her, during a non-adjudicatory fact-finding interview; if she wanted to contest the investigator's findings, Sandra could have asked for a civil hearing, an opportunity that supplies due process. *See Fleury v. Clayton*, 847 F.2d 1229, 1233 (7th Cir. 1988). But she chose to forego that opportunity. Sandra responds that she feared that a hearing would be unfair. But "if [s]he thought that the Board would disregard the evidence, [s]he still had to make [her]

record and obtain review in state court if [her] fears should be realized." *Id.* Finally, the investigator's prediction of a two-year suspension is not coercion, for "an overbearing attorney does not violate the Due Process Clause by stressing the grave consequences that may attend failure to bargain." *Id.*

One brief matter remains. Sandra asks us to find that she is unable to pay the Department's bill of costs. But the district court had not ruled on the bill at the time that she filed her notice of appeal, so we have no jurisdiction over the matter in this appeal. *See United States v. Bonk*, 967 F.3d 643, 648–50 (7th Cir. 2020).

We have considered Sandra's remaining arguments, and none has merit.

                                                                                    AFFIRMED