In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 17-1507

JOSEPH MILLER,

*Plaintiff-Appellant,*

*v.*

MICHAEL DOWNEY, *et al.*,

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:14-cv-2211 — **Colin S. Bruce**, *Judge.*

───────────────

ARGUED DECEMBER 5, 2018 — DECIDED FEBRUARY 8, 2019

───────────────

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Between 2012 and 2013, the Jerome Combs Detention Center in Kankakee, Illinois, prohibited inmates from receiving any newspapers. While awaiting trial on bank robbery charges, Joseph Miller's family bought him a $279 subscription to the *Chicago Daily Law Bulletin* to help him with his case. Deeming the *Law Bulletin* a newspaper, jail officials precluded Miller from receiving it. Miller responded with a lawsuit challenging the jail's prohibition and

confiscation of the publication and seeking to recover the subscription fee. The district court construed the lawsuit as requiring it to answer, not the narrow question of whether Miller had a right to receive a legal publication like the *Law Bulletin*, but instead the broader question of whether the jail's ban on all newspapers offended the First Amendment. In the end, the district court upheld the newspaper ban and awarded summary judgment to the defendant jail officials. Because the district court erred in reaching and resolving such a broad constitutional question—and the record was not fully developed as it pertains to the jail's restriction on legal publications—we vacate the district court's judgment and remand for further proceedings.

# I

## A

Pursuant to an agreement between the United States Marshals Service and the Kankakee County Sheriff's Office, Joseph Miller was detained at the Jerome Combs Detention Center or JCDC from February 2012 to August 2014 while awaiting trial and sentencing on federal charges. Because the jail did not provide inmates access to federal case law, Miller, a federal prisoner, asked his family to buy him a subscription to a legal publication covering federal criminal law. He wanted to better understand his case and assist with his defense, so his family ordered a one-year subscription to the *Chicago Daily Law Bulletin* and arranged for delivery to him at the facility.

Miller never received his subscription. He instead learned that the publication was deemed contraband because, according to Assistant Chief of Corrections Chad Kolitwenzew,

"[t]he Inmate Handbook states [the jail does] not allow newspapers." Issues of the *Law Bulletin*, therefore, were intercepted every day for ten months and disposed of by jail staff without any notice to Miller.

The JCDC's policy on inmate mail was not a model of clarity during the relevant period. The jail did not maintain a written policy listing what items inmates were prohibited from receiving. Rather, and as best we can tell, the jail considered newspapers contraband because the Inmate Handbook did not expressly say inmates could possess them. Jail officials viewed the *Law Bulletin* as a newspaper because (and apparently only because) it was printed on newsprint.

Adding to the confusion, however, is that during this same period the jail permitted inmates to receive personal subscriptions to *Prison Legal News*. This was so even though *Prison Legal News*, just like the *Law Bulletin*, is printed on newsprint. So, too, was *Prison Legal News* not listed as a permitted item in the JCDC Inmate Handbook.

B

In 2014, after learning that copies of the *Law Bulletin* had been delivered to the JCDC and filing multiple grievances with the jail, Miller filed a *pro se* complaint alleging that the jail's disposal of the publication, especially with no notice to him, violated the First Amendment and the Due Process Clause of the Fourteenth Amendment.

Upon screening Miller's complaint pursuant to 28 U.S.C. § 1915A, the district court determined that Miller stated a colorable First Amendment claim against three jail officials and the Kankakee County Sheriff. Following discovery the defendants moved for summary judgment. Although Miller's

suit focused narrowly on the JCDC's prohibition of the *Law Bulletin*—which he repeatedly stressed and explained was a legal publication and not a daily newspaper akin to the *Chicago Tribune*—the defendants' motion instead asked the district court to treat Miller's claims as broadly challenging the JCDC's newspaper ban. They argued that safety and security risks posed by excess paper in the jail warranted a total ban on newspapers, including the *Law Bulletin.*

The district court accepted the defendants' framing of the issue and granted their motion. Applying the four-factor test announced in *Turner v. Safley*, 482 U.S. 78 (1987), the court concluded that the newspaper ban was permissible given the jail's security, safety, and staffing concerns. The summary judgment record, as the district court saw it, showed that inmates had used newspapers to flood cells and conceal contraband—circumstances justifying a categorical ban. The court also found that the defendants provided evidence that allowing inmates personal newspaper subscriptions "would unnecessarily strain staff resources in monitoring the amount of paper within the facility and sorting the incoming mail." The policy was not an "exaggerated response to legitimate penological concerns," the court continued, because the jail afforded inmates alternative ways to stay current on the news (for example, by watching television) and to work on their legal cases by reading *Prison Legal News* and using the jail's law library.

On appeal, and now represented by counsel, Miller renews his contention that the confiscation of the *Law Bulletin* violated his rights under the First Amendment. He also argues the district court committed error by altogether failing to

address, and perhaps implicitly rejecting, his due process claim.

## II

### A

The district court painted with much too broad a brush and resolved a case never brought by Joseph Miller. Miller is a gifted writer and his *pro se* complaint, prepared in pencil on notebook paper, was remarkable for its clarity and precision. He alleged that the defendant jail officials violated his constitutional rights by confiscating not a newspaper of general circulation, but rather a legal publication, the *Law Bulletin*. He explained that he needed the publication because the JCDC had neither a law library nor any research materials concerning federal case law.

Miller took the same care in opposing the defendants' motion for summary judgment, emphasizing that permitting him (and other federal inmates housed in the Kankakee facility) to receive the *Law Bulletin* (or another legal publication) would not flood the facility with paper, overwhelm mailroom staff, or create excessive security risks. In plain and simple terms, Miller implored the district court to treat his claims for what they were—a lawsuit challenging the JCDC's prohibition and confiscation of a legal publication—and not for what they were not—a request to receive a newspaper.

Though Miller may not have realized it, his submissions to the district court aligned perfectly with the precept that federal courts, as courts of limited jurisdiction, should strive to decide constitutional cases narrowly and refrain from answering questions broader than necessary to resolve the case or controversy before them. The symmetry between Miller's

position and the principle of narrow constitutional decision-making jumps off the pages of his submissions to the district court. And it is this exact principle that charts a straightforward course for resolving Miller's claims.

The resolution of Miller's claims on summary judgment did not require the district court to answer whether a jail's blanket ban on newspapers offends the First Amendment. Miller's counsel rightly observes that the trendline on that question favors Miller. But the defendants are equally right to observe that the question entails complexity because some of the pertinent precedent, including our prior decision in *Kincaid v. Rusk*, 670 F.2d 737 (7th Cir. 1982), predates the Supreme Court's decision in *Turner*. In *Turner* the Court modified preexisting law by announcing a new four-factor test for assessing prison regulations that impinge on inmates' constitutional rights. See 482 U.S. at 89–91. There is no dispute that the *Turner* test applies where, as here, a policy implicates a prisoner's First Amendment rights, including the right to read while detained. See *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005) ("Freedom of speech is not merely freedom to speak; it is also freedom to read."). And so too are the defendants right to observe that a proper analysis of Miller's claim would have to consider whether qualified immunity shielded them from liability if the JCDC's blanket newspaper ban transgressed the First Amendment.

Another factor counseling in favor of taking Miller's claim as he pleaded it is that the Kankakee facility overhauled its publication policy in June 2015. The JCDC now supplies the facility with multiple daily copies of *USA Today* and permits inmates to receive subscriptions to up to four magazines per month. This change suggests that broadly ruling on the

constitutionality of the JCDC's prior policy was unnecessary. And this is particularly so given that just days after Miller filed his complaint—seeking not only money damages but also declaratory and injunctive relief—the district court learned he was transferred to another facility, rendering his request for injunctive relief moot. Put differently, when faced with a First Amendment challenge to an outdated policy brought by an inmate no longer housed at the facility in question, the district court should have resolved the case on narrower grounds, focusing precisely on the case and controversy brought by Miller. See generally *ISI Int'l v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) (emphasizing that "federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions").

The proper path was to answer the narrow and specific claim advanced by Miller—whether the jail's confiscation of his subscription to the *Law Bulletin* violated the First Amendment. See *Hedgwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (explaining that principles of "judicial restraint" counsel in favor of resolving "as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues").

B

Similar considerations caution against us reaching the merits of Miller's First Amendment claim in the first instance. The better approach is to allow the district court and parties the initial opportunity to address the issues presented anew and through the narrower frame of how the *Turner* factors

apply to the JCDC's confiscation of Miller's subscription to a legal publication, the *Law Bulletin*.

Suffice it for us to offer but a few observations relevant to a narrowed consideration of the *Turner* factors. The district court's initial assessment of Miller's claim rooted itself in facts unsupported by the summary judgment record. For example, the court assessed the second *Turner* factor (whether alternative means of exercising the asserted right—here the right to receive and read legal publications—remain available to the inmate) on the view that the JCDC had a law library with resources on federal case law available to federal inmates like Miller. The record shows otherwise. The JCDC had no law library, and while inmates had access to an electronic database with Illinois legal resources, Miller contends that there was a dearth of material on federal law in the jail—a point that went uncontested by the defendants.

On this same factor, it appears that the JCDC's policy (throughout Miller's detention) allowed inmates to receive subscriptions to *Prison Legal News*. The district court viewed this access as important without recognizing that the record left unclear whether, contrary to the jail's policy, inmates were in fact being allowed to receive the publication. Regardless, it is not enough to say, as the district court suggested, that one legal publication is just like the next and thus *Prison Legal News* sufficed to serve a federal inmate's every legal need. What is more, the district court failed to recognize that *Prison Legal News*—just like the *Law Bulletin*—is published on newsprint, a fact casting at least some doubt on the JCDC's contention that banning all newsprint publications was essential to prison safety, a consideration relevant to the first *Turner* factor.

On remand, the right analysis asks whether permitting in-
mates to receive subscriptions to legal publications (subject to
reasonable limitations) jeopardized institutional objectives to
such an extent as to justify the JCDC's confiscation of the *Law
Bulletin*. On this front we make three final observations. *First*,
the district court did not consider whether the JCDC's change
of policy in 2015—to allow inmates to receive up to four mag-
azine subscriptions—warranted discounting the rationale
supporting the JCDC's decision to ban the *Law Bulletin* (and,
if so, to what degree) due to concerns associated with excess
paper. See *Turner*, 482 U.S. at 89 ("[T]here must be a 'valid,
rational connection' between the prison regulation and the le-
gitimate governmental interest put forward to justify it.")
(quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

*Second*, the record on summary judgment contained very
few examples of any publications being used to create safety
risks within the facility. And none of the examples the defend-
ants did provide relate to newsprint publications. Though
mindful that courts must afford substantial deference to
prison administrators on matters of institutional security, see
*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), that latitude is not
boundless: defendants still must present evidence "demon-
strating a specific security concern that bears a nexus to the
prohibited conduct." *Riker v. Lemmon*, 798 F.3d 546, 557 (7th
Cir. 2015).

*Third*, we note based on the public record that the JCDC's
prohibition of the *Law Bulletin* seems in substantial tension, if
not direct conflict, with the County Jail Standards promul-
gated by the State of Illinois. See Ill. Admin. Code tit. 20,
§ 701.180 (providing that inmates in county facilities "may re-
ceive … periodicals subject to inspection and approval by jail

personnel"). The record is silent as to whether the JCDC is a facility subject to the County Jail Standards, and, if so, what specific security concerns prevented the facility from adhering to the regulation and allowing Miller to receive his subscription to the *Law Bulletin*. That the Jail Standards seem to permit inmates to receive all periodicals, while still ensuring prison safety, suggests that Kankakee's prohibition of an even narrower class of publications (specifically, legal publications) was an exaggerated response to its proffered security concerns, a consideration relevant to the entire *Turner* analysis. See *Beard v. Banks*, 548 U.S. 521, 528 (2006). This too warrants consideration on remand.

## III

We owe a final word to Miller's procedural due process claim. Miller alleged that jail officials confiscated and destroyed his copies of the *Law Bulletin* without any notice or opportunity for him to appeal this action. In his amended complaint, he expressly cast this allegation in terms of a violation of the Fourteenth Amendment's Due Process Clause. The district court, however, did not address this claim, perhaps on the view that it was entirely duplicative of Miller's First Amendment claim. But that is not so. Indeed, at a broader level, the imperative of fair process may take on added significance in the domain of free speech. See, *e.g.*, Henry P. Monaghan, *First Amendment "Due Process*," 83 Harv. L. Rev. 518 (1970).

Due process requires that the decision to censor inmate mail must be accompanied by "minimum procedural safeguards." *Procunier v. Martinez*, 416 U.S. 396, 417 (1974), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989); see also *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359,

1368 (11th Cir. 2011) (applying this standard to a due process claim). This standard has generally required officials to provide inmates with notice and an opportunity to object to a confiscation of their mail. See *Martinez*, 416 U.S. at 418. Miller deserves the opportunity on remand to have this claim considered under these standards.

For these reasons, we VACATE the judgment of the district court and REMAND for further proceedings.