In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1876

MOHAMED SALAH MOHAMED A EMAD,

*Plaintiff-Appellant*,

*v.*

DODGE COUNTY, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:19-cv-598 — **Lynn Adelman**, *Judge*.

———————————

ARGUED APRIL 12, 2023 — DECIDED JUNE 26, 2023

———————————

Before SCUDDER, KIRSCH, and LEE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Mohamed Salah Mohamed A
Emad is a devout Muslim who alleges that various officials at
the Dodge County Detention Facility in Wisconsin violated
his rights under the First and Fourteenth Amendments by allowing Christian inmates to engage in certain forms of prayer
but affirmatively prohibiting him (and other Muslims) from
doing the same. The district court entered summary judgment
in the defendants' favor. We reverse.

This case is complex on many levels and the record leaves many important questions unanswered. This became crystal clear during oral argument, as it seemed the parties were discussing two separate cases with different factual records. All we can say with confidence is that Emad's allegations of religious discrimination leave us unsettled. But that observation does not take us very far because it is essential to know with precision how Emad may have experienced discrimination *and* what role, if any, each named defendant played in favoring Christian prayer over Muslim prayer. Without a more developed factual record on those points, the only responsible resolution of this appeal is to return the case to the district court for a more refined evaluation of Emad's three claims.

## I

### A

Drawing on the summary judgment record, we present the facts—as best as we can discern them—in the light most favorable to Emad.

Emad has been an active member of Milwaukee's Islamic community for 25 years. He practices Salah, one of the five Pillars of Islam, by praying five times each day in a state of physical purity. Emad has also long participated every Friday afternoon in a form of congregational prayer known as Jumu'ah. Although most often led by an imam at a mosque, Jumu'ah can be held in other locations so long as the prayer occurs in a group setting.

From March 2018 to May 2019, Emad was an immigration detainee at the Dodge County Detention Facility. He was one of 175 Muslim detainees admitted to the jail during that time. Throughout his detention, Emad remained committed to

daily prayer (Salah) and group prayer (Jumu'ah) but encountered certain policies and practices within the Dodge County jail that he contends limited his ability to pray.

During the relevant period, the Dodge County jail had a written policy providing that "[p]ersonal worship may be done in your cell or beside your bunk. It is not permitted in the dayroom areas." This policy proved problematic for Emad because his cell contained a toilet, leaving him unable to pray in a clean environment in accordance with Salah. The jail also prohibited all "[g]roup activities led by inmates." This limitation kept Emad from participating in Jumu'ah, owing perhaps in large part to jail officials being unable to find a volunteer imam to come to the facility to lead Friday afternoon prayer gatherings.

Emad says that what troubles him most is that, despite these policies, the jail has long permitted Christian inmates to pray quite freely within the facility. This freedom, according to Emad, includes gathering in the dayroom and library for Bible studies and other forms of group prayer.

In April 2019 Emad invoked 42 U.S.C. § 1983 and brought this suit in federal court in Milwaukee. He alleged that the jail's restrictions on Muslim personal prayer and group prayer violated the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause. In terms of relief, Emad sought only money damages from six individuals he named as defendants in their personal capacities: Dale Schmidt (Dodge County Sheriff and head of jail), Anthony Brugger (lead jail administrator), Matthew Marvin, Jeffrey Schlegel, Chris Meyers, and Scott Buckner (all program officers). Emad's complaint also named Dodge County itself as a defendant but only on a claim under Wisconsin law

for indemnity. Emad did not bring any other claims against the County, such as relief under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

B

Once discovery concluded the six named defendants moved for summary judgment. The district court granted their motion.

*Personal Prayer Free Exercise Claim*. The district court understood this claim as challenging whether the jail's prohibition on personal prayer in the dayroom, which forced Emad to pray in his cell next to a toilet, violated the Free Exercise Clause. The defendants responded by insisting that "various legitimate penological interests, including maintenance of security, institutional order, and staff safety" justified the prohibition. But, the district court emphasized, the defendants never went further and explained why allowing Muslim inmates to pray privately at appropriate times in the dayroom would present unmanageable security risks. The failure to do so meant that the defendants had not carried their threshold burden under the four-factor test established by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987). From there, however, the district court pivoted and concluded that all defendants were entitled to qualified immunity because Emad failed to identify a case holding that jail officials violate the Free Exercise Clause "by prohibiting worship in the dayroom or limiting personal worship to a room with a toilet."

*Group Prayer Free Exercise Claim*. When it came to Emad's claim regarding Jumu'ah group prayer, the district court began by acknowledging Emad's failure to specify "which defendants he brings this claim against." As the district court

saw it, Sheriff Dale Schmidt and lead jail administrator Anthony Brugger were "the only defendants who conceivably could be found liable for a violation caused by the policy" because of their managerial roles. The district court then underscored that Emad rooted his group prayer claim in a contention of discrimination—that the jail allowed Christian inmates but not Muslim inmates to congregate in the dayroom or library for prayer. But Emad's claim failed, the district court concluded, because the evidence fell short of showing that either Schmidt or Brugger had awareness of any discriminatory enforcement of jail policy. Regardless, the district court concluded that all defendants were entitled to qualified immunity on the group prayer claim because Emad had "not identified a Seventh Circuit or Supreme Court case establishing an inmate's right to congregational services or inmate-led services."

*Equal Protection Claim*. The district court next determined that Emad's Equal Protection claim failed on the merits because he had not identified evidence that any defendant purposely discriminated against Muslim detainees in favor of Christian detainees when it came to religious programming generally or the jail's policies on personal or group prayer. The district court again focused primarily on Schmidt and Brugger, concluding that the record showed no awareness on either defendant's part of discriminatory enforcement of either jail policy against Muslims. Even more specifically, the district court saw no evidence that Schmidt knew that the policy prohibited more Muslim prayer than prayer by other faith traditions.

*State Law Indemnity Claim Against Dodge County*. In closing, the district court concluded that the Wisconsin indemnity

claim against Dodge County necessarily failed because Emad no longer had a viable claim against any individual defendant. In short, there was no liability for the County to indemnify.

Emad now appeals.

## II

Essential to resolving this appeal is recognizing four distinct yet interrelated dimensions of Emad's claims and their proper adjudication. We need to know with some certainty what happened as a factual matter within the Dodge County facility. We then need to know what role each individual defendant played in any constitutional violation. From there we need to evaluate how the *Turner* factors apply to what may have transpired. And, finally, we need to assess whether qualified immunity shields any defendant from liability.

Mindful of how these inquiries interrelate and having taken our own fresh look at the case—the way the parties litigated Emad's claims, the evidence developed in discovery, and the district court's reasons for entering summary judgment across the board for the defendants—a few observations stand out.

*First*, despite having immersed ourselves in the summary judgment record and briefing (filed both in our court and the district court), we lack any confident understanding of what transpired at the Dodge County jail during the relevant period. We know the harms Emad has alleged. But it is exceedingly difficult to discern with any reliability what the institution allowed and disallowed when it came to individual and group prayer, especially when trying to compare Muslim and Christian detainees. A few examples illustrate the point:

- When it comes to individual prayer, we cannot discern whether or how, despite its policy limiting private prayer to cells, the institution restricted private prayer in the dayroom, library, or other communal locations. The point matters because Emad very much suggests that Christian detainees enjoyed more flexibility than Muslims when it came to praying privately outside their cells.

- At a more detailed level with individual prayer, we remain unsure whether jail officials viewed Emad's request to pray outside his cell, including by using a prayer mat, as something beyond a request to engage in personal prayer. All we mean by this observation is that the record in places suggests that the jail's concern with Emad's personal prayer request had more to do with his desire to use a mat rather than his desire to pray in a location other than his cell.

- Nor can we tell what types of group prayer the institution allowed and disallowed in the dayroom, library, or other locations. For his part, as the non-moving party at summary judgment, Emad has pointed to evidence permitting a finding that the jail allowed some forms of Christian congregational prayer. The record, for example, contains a declaration from a Buddhist inmate who "witnessed Christian detainees hold their own Bible study in the day room without a volunteer religious leader present." This inmate further observed that "[g]uards

witnessed the Bible study sessions, but did nothing to stop them." A Christian inmate submitted a similar declaration stating that "Bible study [was] held by Christian detainees in the day room without a volunteer religious leader present" about "2 or 3 times a week" in groups of "4 [to] 6 people participating" each time. Against this evidence, Emad insists that the institution disallowed any form of Muslim group prayer, whether led by detainees and inmates or by an outside imam. Viewing the evidence in the light most favorable to Emad, it certainly seems like the jail allowed some forms of Christian group prayer but disallowed parallel Muslim group prayer. But the state of the record leaves us with little confidence in the nuances and completeness of these observations.

*Second*, this factual uncertainty leaves us unable to reach reliable legal conclusions as to the individual defendants. Our concern is even more pressing given the relief sought. Remember that Emad is not seeking equitable relief and instead only brought claims for money damages against six individual defendants. That reality makes it necessary for us to focus on the personal involvement of each defendant in any particular violation. See *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021) (discussing the legal standard for supervisors to be personally involved and thus liable under § 1983). On this score the case presents another knot we cannot untangle on appeal.

Both sides briefed the case without much focus on the personal responsibility of the named defendants. This explains why every member of the panel spent considerable time at

oral argument attempting to ascertain what the summary judgment record showed as to the involvement of each individual defendant in conjunction with Emad's personal and group prayer claims. Our confusion only grew when it became clear that the parties themselves could not agree on which defendants were part of each claim. The oral argument left us figuratively throwing our hands in the air, at a loss to know with any confidence what exactly was before us on appeal. Rarely do we find ourselves in this situation.

*Third*, the defendants, for their part, sought to prevail on summary judgment by invoking security concerns as a justification for any prayer restrictions. Their strategy worked, at least in part, as the district court agreed that the jail policy limiting group prayer "serves the interests of security, institutional order, and staff safety," thereby satisfying the first factor of the *Turner* test. Although true that security interests often can justify limitations on group gatherings in the prison context, a policy that operates to discriminate against Muslim detainees cannot satisfy *Turner* as a matter of law. The Supreme Court has emphasized that any penal interest "must be a legitimate *and neutral one*," which means the policy must "operate[ ] *in a neutral fashion*, without regard to the content of the expression." *Turner*, 482 U.S. at 90 (emphasis added). Emad has pointed to evidence—at least as the case presently comes to us—raising a serious question whether the Dodge County facility applied its group prayer policies inconsistently between Muslims and Christians.

As for personal prayer, we share the district court's concern that the evidence the defendants offered in support of their purported security concerns fell far short of satisfying *Turner*. Indeed, the defendants did no more than offer

"reflexive, rote assertions" of security concerns. *Nigl v. Litscher*, 940 F.3d 329, 334 (7th Cir. 2019). We have cautioned prison officials that they "cannot rely on the mere incantation of a penal interest but must come forward with record evidence that substantiates that the interest is truly at risk." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1004 (7th Cir. 2019). The defendants have not heeded that instruction.

## III

At this point it is important to return to where the district court ended its analysis of Emad's personal and group prayer claims under the Free Exercise Clause—with awards of qualified immunity to all defendants. We cannot bring ourselves to agree in the circumstances before us.

Start by recognizing what an award of qualified immunity is. It is a *legal determination* that, *on particular facts*, a party committed either no legal violation at all or at least not one clearly established in the law at the time of the challenged conduct. See *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (establishing a two-pronged inquiry for an award of qualified immunity); *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (reiterating the same two-pronged test in a case concerning appellate jurisdiction over a district court's denial of qualified immunity).

At summary judgment, these determinations—whether we start at prong one or prong two—must be made by taking the facts in the light most favorable to the plaintiff, here Emad. See *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). But the legal determination is not possible when facts material to the plaintiff's claim remain so imprecise. See *Pearson v. Callahan*, 555 U.S. 223, 238–39 (2009) (explaining the difficulty of awarding qualified immunity when "the precise factual basis for the

plaintiff's claim" is "hard to identify"); *Smith v. Finkley*, 10
F.4th 725, 750 (7th Cir. 2021) (explaining that "[t]he existence
of material factual disputes 'precludes a ruling on qualified
immunity'" (quoting *Strand v. Minchuk*, 910 F.3d 909, 918 (7th
Cir. 2018)).

We find ourselves in just that situation here. We see unre-
solved questions of fact—the ones we have highlighted—on
points central to resolving Emad's personal and group prayer
claims under the Free Exercise Clause. This means that we
cannot resolve qualified immunity on prong one. With so lit-
tle confidence in knowing what even happened within the
Dodge County facility, we are not even sure how we would
describe the conduct receiving immunity.

The district court, for its part, was willing to confer im-
munity to the defendants on prong two—concluding Emad
failed to show any violation of clearly established law by any
defendant while accepting his core version of events. We see
that conclusion as a bridge too far given the gravity of Emad's
contentions and the robust legal protection that attends to the
right of free exercise and, relatedly, the right to worship free
of discrimination based on one's choice of faith. See, *e.g.*, *Ken-
nedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022); *Mas-
terpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719,
1731 (2018); *Church of the Lukumi Babalu Aye, Inc. v. City of Hi-
aleah*, 508 U.S. 520, 532 (1993); *Bd. of Educ. of Kiryas Joel Village
Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., con-
curring) ("[T]he [Constitution's] Religion Clauses—the Free
Exercise Clause, the Establishment Clause, the Religious Test
Clause, Art. VI, cl. 3, and the Equal Protection Clause as ap-
plied to religion—all speak with one voice on this point:

Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits.").

Doubtless the district court was correct in its observation that there are few, if any, cases expressly saying that the Free Exercise Clause prohibits affording certain private and group prayer allowances to Christian but not Muslim detainees and inmates. And doubtless, too, the district court was right to underscore the Supreme Court's repeated admonition that prong two of a proper qualified immunity inquiry requires identifying the pertinent body of clearly established law at a high level of specificity. But those observations, right though they may be as a general legal matter, do not afford us enough confidence to affirm the awards of qualified immunity on Emad's personal and group prayer claims under the Free Exercise Clause.

If free exercise in jail means anything, it means that jailers, absent some extraordinary justifications, cannot treat inmates differently based on religion. See *Masterpiece Cakeshop*, 138 S. Ct. at 1731 ("The Free Exercise Clause bars even subtle departures from neutrality on matters of religion." (internal quotation omitted)); *Church of the Lukumi*, 508 U.S. at 532 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."); *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012) (explaining how a prison's unequal treatment of different religions "could not reasonably be thought constitutional"). Indeed, that neutrality precept is the cornerstone of the protections conferred by the Free Exercise Clause.

At bottom, Emad has invoked his rights under the First and Fourteenth Amendments to be treated like his fellow

Christian detainees—to be allowed to pray as they are allowed to pray. We have no trouble concluding that Emad's claims fall in the heartland of these constitutional protections such that qualified immunity cannot be awarded in the circumstances before us here.

**IV**

We owe a brief word on Emad's claim under the Equal Protection Clause as well. Here, too, we return to the factual uncertainty that has permeated our reasoning and our conclusion that further proceedings are necessary in the district court, as that uncertainty bars proper adjudication of this claim on appeal. But we also acknowledge that the legal framework defining how the Equal Protection Clause applies to contentions of religious discrimination—including prayer in prisons—is surprisingly underdeveloped in the case law. See generally *Johnson v. California*, 543 U.S. 499, 509–11 (2005) (discussing the applicability of *Turner* versus strict scrutiny in the context of a prison discriminating based on race). The parties and district court would do well to focus on the point on remand. At the very least, and in close keeping with other claims rooted in the Equal Protection Clause, Emad has to show that a named defendant intentionally treated him, a Muslim detainee, differently than Christian detainees. See *Taylor*, 999 F.3d at 494 ("[P]ersonal involvement in the equal protection context requires specific intent to discriminate."). Perhaps this will prove too difficult to establish. All we know is that the present record, viewed in the light most favorable to Emad, does not allow us to reach any reliable conclusion.

*     *     *

We leave the structure of the proceedings on remand to the district court's sound discretion. It may be that the district court determines that a trial is in order to allow essential fact finding. Or perhaps the district court will invite a new round of refined and targeted summary judgment motions on the present record or after additional discovery designed to develop the record with more clarity. We take no position on the next steps. At the very least, we trust the parties will meet and confer in an effort to streamline the litigation as much as possible for the district court.

With these closing observations, we REVERSE and REMAND for proceedings consistent with this opinion.