In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1725

ROBERT DECKER,

*Plaintiff-Appellant,*

*v.*

KATHERINE SIREVELD, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:19-cv-00233-JPG — **J. Phil Gilbert**, *Judge.*

_____

ARGUED MAY 21, 2024 — DECIDED JULY 30, 2024

_____

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Federal inmate Robert Decker requested that his prison law library provide electronic access to full, daily editions of the Federal Register. When the Bureau of Prisons denied his request, Decker filed this lawsuit pro se under the Administrative Procedure Act, alleging that the denial violated his First Amendment rights to receive information and petition the government in the form of public comments on notices of proposed rulemaking. The district

court entered summary judgment for the BOP. Applying the framework established by the Supreme Court in *Turner v. Safley*, the district court concluded that the Bureau's policy was "reasonably related to [its] legitimate penological interest[]" in conserving limited resources and so did not violate the First Amendment. 482 U.S. 78, 89 (1987). The district court also denied Decker's motions for the recruitment of counsel, finding that he had proven himself competent to litigate his case despite the obstacles he faced while incarcerated. We agree with both conclusions and affirm.

**I**

**A**

To enable inmates to research and litigate legal claims, the Bureau of Prisons provides a law library at each of its facilities. Most prison libraries contain computers that have been disabled from accessing the internet. Instead, the computers link to an "electronic bulletin board"—an internal database of PDF documents uploaded manually by prison staff for inmates to consult during legal research.

BOP policy directs each prison to maintain a list of required texts at its library. That list currently includes the Supreme Court Reporter, the Federal Reporter, the U.S. Code, and the Code of Federal Regulations. It does not include the full Federal Register, the federal government's daily publication of proposed rules, executive orders, and other administrative documents. Rather than provide complete editions of the Federal Register, the BOP directs law libraries to maintain only those "documents … pertaining to the Bureau and to the U.S. Parole Commission." Bureau Program Statement 1315.07 (Nov. 5, 1999).

B

In 2019 Robert Decker filed suit against several BOP officials under the Administrative Procedure Act. He alleged that the BOP's failure to upload the full Federal Register to its electronic bulletin board violated his rights under the First, Fifth, and Fourteenth Amendments to receive information and petition the government. Decker claimed that without electronic access to the Federal Register, he could not submit timely public comments on proposed rules that concerned him, a right generally guaranteed by the APA. See 5 U.S.C. § 553.

The district court dismissed Decker's complaint at the screening stage pursuant to the Prison Litigation Reform Act. See 28 U.S.C. § 1915A. We vacated and remanded, observing that open questions remained regarding which specific documents the BOP had provided Decker and whether its failure to provide the full Federal Register violated his constitutional rights.

On remand the case proceeded to discovery. Decker filed several motions seeking recruitment of counsel, which the district court denied. The district court explained that Decker had not demonstrated a need for an attorney, given that he had competently represented himself throughout the case and could request deadline extensions as his circumstances required.

In time the government moved for summary judgment. It contended that the BOP's decision to provide only Bureau-related documents published in the Federal Register did not violate Decker's constitutional rights because, under *Turner v. Safley*, the policy was "reasonably related to [the BOP's]

legitimate penological interest[]" in conserving scarce resources. See 482 U.S. at 89.

The government supported its position with an affidavit from Sarah Qureshi, a BOP official who had been responsible for drafting and distributing the agency's regulations. The affidavit stated that "it would be impractical and highly burdensome on limited BOP staffing resources to devote staff time and expense to post the entire Federal Register to the Electronic Bulletin Board each day." The BOP saw Decker's rights, by contrast, as only minimally burdened because he remained free to receive print copies of the Federal Register through the mail. In the end, the district court agreed with the government that no genuine dispute of material fact existed regarding whether the BOP's policy "reasonably related" to its legitimate interest in saving resources. Based on that conclusion, the district court entered summary judgment in the government's favor.

Decker filed a timely notice of appeal. We then appointed counsel to represent Decker. His counsel, H. Hunter Bruton and his colleagues, have our thanks for the diligence and skill they have brought to their advocacy.

## II

We review the district court's order entering summary judgment with a fresh set of eyes, asking whether any genuine issue of material fact exists regarding the constitutionality of the challenged BOP policy and, if not, whether the government is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). In conducting this inquiry, we construe the facts and draw all reasonable inferences in favor of Decker as

the party opposing summary judgment. See *Anderson*, 477 U.S. at 255.

It is well-established that prisoners do not surrender all of their First Amendment rights upon their incarceration. See *Turner*, 482 U.S. at 84 ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). It is equally clear that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights" given the need to achieve "valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (quotation omitted). Courts "accord substantial deference to the professional judgment of prison administrators" in defining and pursuing such penological objectives—a process which necessarily involves the curtailment of certain constitutional rights. See *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Balancing respect for inmates' constitutional rights with the harsh realities of prison administration can be a difficult endeavor. Recognizing the challenge, the Supreme Court has supplied a framework for assessing the constitutionality of prison regulations. The controlling standard comes from *Turner*: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Satisfying the standard requires the government in the first instance to articulate a penological interest that is both legitimate and neutral. See *id.* at 90; *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011). From there the burden shifts to the prisoner to demonstrate that a challenged prison

regulation is not reasonably related to that interest. See *Overton*, 539 U.S. at 132.

*Turner* established four factors that inform the constitutional validity of a prison regulation: (1) the existence of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) whether "alternative means of exercising the [inmate's constitutional] right [] remain open;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) the existence of "ready alternatives" to the challenged regulation. 482 U.S. at 89–90.

The first of these factors imposes a threshold requirement that every regulation must meet. See *id.*; see also *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010). A "regulation cannot be sustained," the Supreme Court has emphasized, "where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90.

We address each factor in turn.

### A

*Turner*'s first factor concerns the closeness of the logical connection between the challenged prison policy and the asserted penological interest it advances. We have held that reducing administrative costs—the interest asserted by the BOP here—qualifies as a legitimate penological objective. See *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007); *Lindell v. Frank*, 377 F.3d 655, 659 (7th Cir. 2004). The question, then, is whether providing federal inmates like Robert Decker only

limited electronic access to the Federal Register "rational[ly] connect[s]" to that interest. *Turner*, 482 U.S. at 89.

The parties stake out competing views. For its part, the BOP contends its policy rationally advances its budgetary interests by avoiding an undue financial burden. In support it draws upon a line from the Qureshi affidavit stating that electronically providing the full Federal Register would be "impractical and highly burdensome on limited BOP staffing resources."

Decker disagrees and claims that the affidavit submitted by Sarah Qureshi is too thin to dispel any reasonable factual dispute over how burdensome his proposed accommodation would be. He emphasizes that under our case law "a prison may not restrict a prisoner's rights without even looking to see how the rights might be accommodated and estimating the expense entailed by doing so." *Kikumura v. Turner*, 28 F.3d 592, 599 (7th Cir. 1994). Nor may the government "avoid court scrutiny by reflexive, rote assertions," *Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir. 1996), or "rely on the mere incantation of a penal interest," *Emad v. Dodge Cnty.*, 71 F.4th 649, 654 (7th Cir. 2023). Decker contends that the Qureshi affidavit is just that—a "reflexive, rote assertion[]"summarily declaring that the proposed accommodation would be too burdensome. That statement alone, Decker insists, is not enough to eliminate any factual question as to the severity of the government's burden. See *Shimer*, 100 F.3d at 509 (emphasizing that a "prison administration must proffer some evidence to support its restriction of [inmates'] constitutional rights" (internal quotation marks omitted)); *Emad*, 71 F.4th at 654 (stating that, to prevail under *Turner*, the government must

"come forward with record evidence that substantiates that the interest is truly at risk").

Decker emphasizes that, at the very least, the BOP's position that it would be too burdensome to electronically provide the Federal Register is subject to reasonable factual dispute. Anyone with internet access, Decker observes, can download a full day's edition in a matter of seconds by clicking three times on www.federalregister.gov. He sees the government's proposed alternative—receiving print copies of the Federal Register through the U.S. mail and prison's internal mail system—as far more costly, since it would require administrators to manually screen, process, and deliver documents running hundreds of pages on a regular basis. This reality, Decker continues, is enough for reasonable jurors to disagree on whether electronically supplying the Federal Register would be unduly burdensome, particularly if the government did so only on a periodic basis—say, every week or two.

While much of Decker's argument is well-taken, it too discounts the highly deferential nature of the *Turner* analysis. The Supreme Court has repeatedly described *Turner* as a framework that affords significant weight to the professional views of prison officials. See, *e.g., Florence v. Bd. of Chosen Free-holders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012) (describing *Turner* as a holding that "confirmed the importance of deference to correctional officials"); *Johnson v. California*, 543 U.S. 499, 504 (2005) (emphasizing that *Turner* is a "deferential standard"); *Shaw v. Murphy*, 532 U.S. 223, 239 (2001) (same). Given the "inordinately difficult undertaking that is modern prison administration," we owe "considerable deference to the determinations of prison administrators." See *Thornburgh*

*v. Abbott*, 490 U.S. 401, 407–08 (1989) (quotation marks omitted). Such deference is an essential component of both the *Turner* framework and, more broadly, our role as a court of general review. Right to it, we afford substantial deference to the BOP's assertion that providing electronic access to the full Federal Register would require it to divert significant time and resources that could otherwise be devoted to other tasks.

Recognize as well that, in response to the BOP's affidavit, Decker did not come forward in the district court with any concrete evidence calling its conclusions into doubt. See *Overton*, 539 U.S. at 132 (emphasizing that under *Turner*, "[t]he burden [] is not on the State to prove the validity of prison regulations but on the prisoner to disprove it"). Regardless, Decker's position also underappreciates a critical feature of this case that makes it unique. Nearly every published decision in which we have applied *Turner* involved an affirmative restriction on an inmate's conduct. See, *e.g.*, *Montoya v. Jeffreys*, 99 F.4th 394 (7th Cir. 2024) (reviewing a policy presumptively restricting sex offenders' contact with their minor children); *Riker v. Lemmon*, 798 F.3d 546 (7th Cir. 2015) (reviewing a prohibition on a request for a prisoner to marry); *Nigl v. Litscher*, 940 F.3d 329 (7th Cir. 2019) (same). In the First Amendment context, these restrictions routinely take the form of categorical prohibitions on the materials that an inmate may receive through the mail. See, *e.g.*, *Lindell*, 377 F.3d 655 (reviewing a prison's ban on the receipt of printed materials from non-official publications); *Jackson*, 509 F.3d 389 (reviewing a prison's prohibition on a specific photograph); *Mays v. Springborn*, 575 F.3d 643 (7th Cir. 2009) (reviewing a prison's decision to remove pages of a magazine containing gang signs); *Singer*, 593 F.3d 529 (reviewing the confiscation

of particular published material); *Van den Bosch*, 658 F.3d 778 (same).

Here, by contrast, the BOP has placed no restriction on the type, source, or volume of materials that Decker seeks to receive. To the contrary, the Bureau has repeatedly pledged to allow Decker to arrange for the delivery of physical copies of the Federal Register through the prison mail system. The Qureshi affidavit confirms that the BOP has also committed to electronically provide Federal Register documents that "pertain[]" or "relate[]" to the Bureau. That, of course, is in addition to the full suite of criminal-law research materials available at BOP law libraries—the adequacy and availability of which Decker does not challenge.

Decker insists that this is not enough. He emphasizes that the BOP has deemed some regulatory subjects that directly affect him—inmate calling services, for instance—as not "pertaining to the Bureau" and thus not included in the electronic bulletin board. To ensure access to all such regulations, Decker asks us to impose an affirmative obligation on the BOP to electronically provide every daily edition of the Federal Register in full.

This request—not to discontinue a ban on certain publications but to proactively supply them—sets Decker's claim apart. When, as here, a prisoner seeks a court mandate compelling the BOP to furnish particular materials at regular and frequent intervals across all facilities at its own cost, the danger of overstepping our judicial role is at its apex. Recognizing that "the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management," we hesitate to embrace any course of action that would lead

to the micromanagement of prison administration from the bench. See *Thornburgh*, 490 U.S. at 407–08.

Consider the alternative. If we find in favor of Decker today, there is a unique likelihood that this case would lead to a cascade of similar requests that would, in the aggregate, place an inordinate burden on the prison system. Such a burden would be particularly difficult to justify given that law libraries must already provide documents "pertaining to the Bureau." As such, we conclude that the BOP's denial of that request is reasonably related to its legitimate interest in saving resources.

B

Proceeding to the next *Turner* factor, we assess whether Decker possessed "alternative means of exercising [his] right"—in this case the First Amendment right to petition the government—despite his lack of electronic access to the Federal Register. See 482 U.S. at 90; see also *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (recognizing that "prisoners have the constitutional right to petition the Government for redress of their grievances").

Decker contends that the BOP's policy left him with no alternative means of exercising his right to petition through the submission of public comments on proposed regulations. He emphasizes that the APA allows agencies to promulgate rules after receiving and considering comments for only 30 days. See 5 U.S.C. § 553(d). Without regular and timely electronic access to the Register, Decker claims that it is impossible for him to meet such a 30-day deadline, given the routine and significant delays that accompany the delivery of prison mail.

After carefully reviewing the record and drawing all factual inferences in favor of Decker as the nonmovant at summary judgment, we accept his assertion that electronic access to the Federal Register is necessary for him to reliably submit timely public comments. As Decker observes, in this litigation alone his legal mail was delayed for more than 30 days on multiple occasions, despite the BOP prioritizing it above other categories of mail. The government has not denied such delays, nor has it provided any reason to conclude that Decker could still meet the statutory deadline for comments. Nor has the government contradicted Decker's two additional reasons for the lack of alternative means of exercising his right to petition—the prohibitive cost of a print subscription to the Federal Register and prison policies that would bar him from storing and consulting physical editions at the facility. Given these unrebutted and plausible objections, we conclude that a genuine factual dispute exists regarding whether Decker can timely comment on proposed regulations under existing BOP policy. For that reason, *Turner*'s second factor weighs in Decker's favor.

That conclusion does not end our inquiry, however. Although "[t]he absence of any alternative [] provides some evidence that the regulations [a]re unreasonable," it "is not conclusive of the reasonableness of the [p]olicy." *Beard v. Banks*, 548 U.S. 521, 532 (2006) (quoting *Overton*, 539 U.S. at 135) (internal quotation marks omitted). So we proceed to consider the remaining factors of the *Turner* framework.

C

Any weight given to Decker's position under the second *Turner* factor is counterbalanced by the third: "the impact accommodation of the asserted constitutional right will have

on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90. It is worth emphasizing anew the uniqueness and breadth of the accommodation that Decker seeks. He asks not for the removal of a prohibition on receipt of the Federal Register but for a judicial decree obligating the BOP to upload every day's edition to its electronic bulletin board for all federal prisoners nationwide.

We also see no limiting principle to the type of relief that Decker seeks. If he were correct that *Turner* requires prison officials to affirmatively offer electronic access to the Federal Register, the same could be said of any number of other government publications. Prisons would potentially have to provide administrative records from each of the 50 states—at least those that can be downloaded online with equivalent ease as the Federal Register. With each new request for a different publication, administrative costs would mount and managerial responsibilities compound. We decline the invitation to embark on a course so inevitably destined to overburden and tamper with the "allocation of prison resources"—an outcome starkly at odds with our deferential role under *Turner*. See 482 U.S. at 90.

To be sure, we recognize that "[t]he proper path [i]s to answer the narrow and specific claim advanced by [the plaintiff]" on "the narrowest possible grounds" when evaluating a prisoner's claim for relief under *Turner*. See *Miller v. Downey*, 915 F.3d 460, 464 (7th Cir. 2019) (citing *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012)). In keeping with that principle, we express no definitive opinion on what the consequences of granting Decker's specific claim for accommodation would be in future similar cases where a prisoner seeks publications other than the Federal Register.

Our only point here is that it is appropriate to consider the presence or absence of a limiting principle when assessing the likely administrative burden on the prison of granting Decker's request for accommodation. Because Decker's claim creates a substantial risk of opening the door to an endless procession of future similar requests for accommodation —requests that, if granted, would significantly tax the BOP's limited resources—we conclude that *Turner*'s third factor strongly favors the government.

D

That brings us to the fourth and final factor of the *Turner* analysis. "[T]he absence of ready alternatives" to the challenged prison regulation "is evidence of [its] reasonableness." *Turner*, 482 U.S. at 90. "By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.*

We conclude that no ready alternative regulation can fully accommodate Decker's rights without meaningfully compromising the prison's interest in conserving resources. Decker's only proposed alternative—providing the full Federal Register at irregular weekly or biweekly intervals—would still require an expenditure of time and resources to implement. And, even if there were a more ideally calibrated policy, the existence of that hypothetical would not render the BOP's chosen policy invalid. Indeed, we have emphasized that even when "the DOC's asserted penological objectives … might

very well be achieved with a narrower policy, the absence of an ideal policy does not render the policy that officials have adopted unconstitutional." *Van den Bosch*, 658 F.3d at 790. Here, the BOP has made the reasonable managerial decision to save resources by electronically providing only limited administrative documents that directly impact many prisoners. *Turner*'s fourth factor requires no more.

* * *

In the final analysis, we conclude that the balance of the *Turner* factors supports the BOP's policy of providing only limited electronic access to the Federal Register as "reasonably related" to its "legitimate penological interest" in conserving resources. *Turner*, 482 U.S. at 89. Although the BOP policy places some burden on Decker's constitutional rights, such a burden is consistent with the recognition that "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," and that "[i]n the First Amendment context, … some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw*, 532 U.S. at 229 (citing *Pell*, 417 U.S. at 822).

Be careful, however, not to overread our decision as approving a wholesale denial of electronic access to all administrative documents from the Federal Register. Recall that, under the BOP policy we affirm today, prison libraries must provide access to all "documents … pertaining to the Bureau and to the U.S. Parole Commission." See Bureau Program Statement 1315.07 (Nov. 5, 1999). Decker's fourth amended complaint alleged that the BOP had violated this provision by failing to upload even Bureau-issued documents to its

electronic bulletin board. Because the BOP subsequently remedied this omission and Decker seeks only injunctive relief, this claim is no longer before us. In short, in no way does today's decision foreclose a claim alleging that the Bureau has failed to electronically provide documents from other agencies that "pertain[] to" the Bureau, such as proposed amendments from the U.S. Sentencing Commission. We express no opinion on the merits of such a claim.

## III

In addition to challenging the BOP's policy concerning the Federal Register, Decker separately appeals the district court's denial of his motions for the recruitment of counsel. He claims that the district court abused its discretion in declining to recruit an attorney to aid him in his lawsuit, stressing that he was unable to adequately litigate on his own.

A district court may, at its discretion, "request an attorney to represent any person unable to afford counsel" under 28 U.S.C. § 1915(e)(1). In evaluating a § 1915 request, the court ought to consider whether "the indigent plaintiff [has] made a reasonable attempt to obtain counsel or been effectively precluded from doing so" and, if so, whether "given the difficulty of the case, … the plaintiff appear[s] competent to litigate it himself." *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc). The district court found—and the BOP does not dispute—that Decker made reasonable and unsuccessful efforts to obtain counsel on his own. So the sole remaining question is whether the district court abused its discretion in concluding that Decker was competent to litigate his case pro se.

A district court does not abuse its discretion in declining to recruit counsel under § 1915 unless "(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary." *Id.* at 658. None of these grounds applies in this case.

Decker contends that the district court either ignored or dismissed several factors that compromised his ability to represent himself, including his limited access to the law library while confined to the Special Housing Unit, his restrictive conditions of confinement pending a facility transfer, his nine other pending cases, and substantial delays in receiving his mail. While these considerations undoubtedly presented challenges, the district court's determination that they did not necessitate counsel was not arbitrary, irrational, or based on erroneous legal or clearly erroneous factual conclusions. See *id.* In its § 1915 order, the district court directly addressed Decker's limited access to the law library, explained why Decker had proven himself competent to litigate despite this hurdle, and explained that the court could extend discovery deadlines as his situation required. Informed as it was by a careful consideration of the circumstances that Decker faced in his self-representation, the district court's order did not constitute an abuse of discretion.

For these reasons, we AFFIRM.